UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 19-cr-10081 |
| v. | Violations: |
| (1) GORDON ERNST,<br>(2) DONNA HEINEL,<br>(3) LAURA JANKE,<br>(4) ALI KHOSROSHAHIN,<br>(5) STEVEN MASERA,<br>(6) MIKAELA SANFORD,<br>(7) MARTIN FOX,<br>(8) IGOR DVORSKIY,<br>(9) LISA "NIKI" WILLIAMS,<br>(10) WILLIAM FERGUSON,<br>(11) JORGE SALCEDO, and<br>(12) JOVAN VAVIC,<br><br>Defendants. | Count One: Racketeering Conspiracy<br>(18 U.S.C. § 1962(d))<br><br>Racketeering Forfeiture Allegations:<br>(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1963<br>and 28 U.S.C. § 2461) |

SEALED

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1. Defendant GORDON ERNST ("ERNST") was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts. Until January 2018, ERNST was employed as the head coach of men's and women's tennis at Georgetown University.

2. Defendant DONNA HEINEL ("HEINEL") was a resident of Long Beach, California. HEINEL was employed as the senior associate athletic director at the University of Southern California.

3.     Defendant ALI KHOSROSHAHIN ("KHOSROSHAHIN") was a resident of Fountain Valley, California. Until November 8, 2013, KHOSROSHAHIN was employed as the head coach of women's soccer at the University of Southern California.

4.     Defendant LAURA JANKE ("JANKE") was a resident of North Hollywood, California. Until January 10, 2014, JANKE was employed as an assistant coach of women's soccer at the University of Southern California. JANKE reported to KHOSROSHAHIN until his departure from the university.

5.     Defendant JOVAN VAVIC ("VAVIC") was a resident of Rancho Palos Verdes, California. VAVIC was employed as the water polo coach at the University of Southern California.

6.     Defendant JORGE SALCEDO ("SALCEDO") was a resident of Los Angeles, California. SALCEDO was employed as the head coach of men's soccer at the University of California at Los Angeles.

7.     Defendant WILLIAM FERGUSON ("FERGUSON") was a resident of Winston-Salem, North Carolina. FERGUSON was employed as the women's volleyball coach at Wake Forest University.

8.     Defendant LISA "NIKI" WILLIAMS ("WILLIAMS") was a resident of Houston, Texas. WILLIAMS was employed as an assistant teacher at a public high school in Houston. WILLIAMS also served as a compensated standardized test administrator for the College Board and ACT, Inc.

9.     Defendant MARTIN FOX ("FOX") was a resident of Houston, Texas. FOX was employed as the president of a private tennis academy and camp in Houston.

10.     Defendant IGOR DVORSKIY ("DVORSKIY") was a resident of Sherman Oaks, California. DVORSKIY was employed as the director of a private elementary and high school

located in Los Angeles, California. DVORSKIY also served as a compensated standardized test administrator for the College Board and ACT, Inc.

11.     Defendant STEVEN MASERA ("MASERA") was a resident of Folsom, California. Until December 2017, MASERA was employed as an accountant and financial officer for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

12.     Defendant MIKAELA SANFORD ("SANFORD") was a resident of Sacramento, California. SANFORD was employed in various capacities for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

### The Enterprise

13.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business in Newport Beach, California, founded by William Rick Singer in or about 2007 and incorporated in the State of California in or about 2012.

14.     The Key Worldwide Foundation ("KWF") was a non-profit corporation in Newport Beach, California that Singer established as a purported charity in or about 2012. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

15.     Together, The Key and KWF constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) (the "Key Enterprise"), that is, an association in fact of entities engaged in, and the activities of which affected, interstate and foreign commerce. The Key

Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Other Relevant Entities

16.  ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college admissions process in the United States.

17.  The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a nonprofit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States. The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

18.  Georgetown University ("Georgetown") is a highly selective private university located in Washington, D.C.

19.  Stanford University ("Stanford") is a highly selective private university located in Palo Alto, California.

20.  The University of California at Los Angeles ("UCLA") is a highly selective public university located in Los Angeles, California.

21.  The University of San Diego ("USD") is a selective private university located in San Diego, California.

22.  The University of Southern California ("USC") is a highly selective private university located in Los Angeles, California.

23.     The University of Texas at Austin ("U-Texas") is a highly selective public university located in Austin, Texas.

24.     Wake Forest University ("Wake Forest") is a highly selective private university located in Winston-Salem, North Carolina.

25.     Yale University ("Yale") is a highly selective private university located in New Haven, Connecticut.

26.     The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

27.     Each of the Universities annually receives more than $10,000 in federal grants.

Background on Standardized Testing and the College Admissions Process

28.     Most selective colleges in the United States require students to take a standardized test, such as the ACT or the SAT, as part of the admissions process.

29.     The ACT includes sections on English, mathematics, reading and science.

30.     The SAT includes sections on writing, critical reading and mathematics.

31.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

32. Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

33. Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT is the property of the College Board, and that no one other than the student can "open a test book and see the test content."

34. The ACT tests are sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

35. The SAT tests are sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

36. Most of the Universities require prospective students to submit standardized test scores as part of their application packages. When submitted, standardized test scores are a material part of the admissions process at each of the Universities.

37. All of the Universities recruit student athletes, and typically apply different criteria when evaluating applications from students with demonstrated athletic abilities. Recruited student athletes at USC, for example, are typically considered by a designated admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes. The admissions offices at the Universities typically allot a set number of slots to each varsity head coach for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases

6

significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

Purposes of the Racketeering Conspiracy

38.     The principal purposes of the racketeering conspiracy included the following:

     a.     to facilitate cheating on college entrance exams;

     b.     to facilitate the admission of students to elite universities as recruited athletes, regardless of their athletic abilities; and

     c.     to enrich the defendants and Singer personally.

Manner and Means of the Racketeering Conspiracy

39.     Among the manner and means by which the defendants, Singer, and others known and unknown to the Grand Jury carried out the racketeering conspiracy were the following:

     a.     facilitating cheating on the ACT and SAT exams in exchange for bribes by arranging for or allowing a third party—generally Mark Riddell, a resident of Palmetto, Florida—to secretly take the exams in place of the actual students, or to replace the students' exam responses with his own;

     b.     designating applicants as purported recruits for competitive college athletic teams, without regard for the applicants' athletic abilities, in exchange for bribes; and

     c.     concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts.

Acts in Furtherance of the Racketeering Conspiracy

40.     On various dates between 2011 and February 2019, the defendants, Singer, and others known and unknown to the Grand Jury committed or caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy:

7

A.    Cheating on Standardized Tests

41.    Singer agreed with clients whose children were scheduled to take the SAT or ACT exams as part of the college admissions process to have Riddell either take the tests in their children's place or correct the children's answers after they had completed the tests.

42.    Parents generally paid Singer between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into one of the KWF charitable accounts.

43.    To facilitate the cheating, Singer counseled parents to seek extended time on the exams, including by having their children purport to have learning disabilities in order to obtain medical documentation that ACT, Inc. and the College Board typically required before granting students extended time.

44.    Singer used the purported charitable donations from parents, at least in part, to bribe DVORSKIY, who administered the SAT and ACT exams at the private school in Los Angeles, California where he worked, and WILLIAMS, who administered the exams at the public high school in Houston, Texas where she worked.

45.    At Singer's direction, MASERA sent the bribe payments to DVORSKIY— typically $10,000 per student—from one of the KWF charitable accounts.

46.    Singer initially funneled the bribe payments to WILLIAMS through FOX, but in July 2018, Singer sent WILLIAMS a $5,000 check directly.

47.    In exchange for the bribe payments, DVORSKIY and WILLIAMS allowed Riddell to secretly take the ACT and SAT tests in place of the children of Singer's clients, or to replace the children's exam responses with his own, in violation of the duty of honest services they owed to ACT, Inc. and the College Board.

8

48.     At Singer's direction, MASERA sent Riddell payments of approximately $10,000 per test, usually from one of the KWF charitable accounts.

49.     DVORSKIY and WILLIAMS caused the falsified exams to be returned to ACT, Inc. and the College Board via Federal Express and UPS, respectively, so that they could be scored.

B.     The Student-Athlete Recruitment Scam

50.     Parents paid Singer approximately $25 million over the period 2011 through February 2019 to bribe coaches and university administrators to designate their children as recruited athletes, or other favored admissions categories, in violation of the duty of honest services the coaches and administrators owed to their employers, thereby facilitating the children's admission to the Universities.

51.     In some instances, SANFORD and JANKE helped fabricate athletic "profiles" and other documents to bolster the students' college applications by making them appear to be highly successful high school athletes when in fact they were not.

52.     SANFORD also took online classes in place of certain students, so that the students could submit the grades SANFORD earned in their names as part of their application packages.

         i.     Yale University

53.     As one example of the recruitment scam, Singer agreed in or about November 2017 to facilitate the admission of an applicant to Yale ("Yale Applicant 1"), in exchange for a payment of $1.2 million from Yale Applicant 1's parents.

54.     On or about November 10, 2017, Singer sent actual biographical information concerning Yale Applicant 1, which contained no mention of soccer, to JANKE, and instructed JANKE to create a falsified athletic profile that would be used to support the student's application. Singer wrote in an email:  "[C]ould you please create a soccer profile asap for this girl who will

9

be a midfielder and attending Yale so she has to be very good. Needs to play Academy and no high school soccer, put down you and or Ali [KHOSHROSHAHIN] as coaches for Academy FC Newport etc … awards and honors – more info to come – need a soccer pic probably Asian girl."

55.     In a subsequent email, Singer instructed JANKE to add to the profile that Yale Applicant 1 had been on the "JR National Development Team in China," noting, "we are saying she got hurt this past spring, so was not recruited till now as she got her release late summer."

56.     After JANKE completed the fake profile, which described Yale Applicant 1 as the co-captain of a prominent club soccer team in southern California, Singer sent the profile to Rudolph "Rudy" Meredith, who was the head coach of the Yale women's soccer team.

57.     Meredith designated Yale Applicant 1 as a recruit for the Yale women's soccer team despite the fact that, as Meredith knew at the time, Yale Applicant 1 did not play competitive soccer.

58.     On or about January 1, 2018, after Yale Applicant 1 was admitted to Yale, Singer mailed Meredith a check for $400,000, drawn on one of the KWF charitable accounts.

59.     In or about the spring and summer of 2018, Singer's client paid Singer approximately $1.2 million in multiple installments, including approximately $900,000 that was paid into one of the KWF charitable accounts.

      ii.     <u>USC</u>

60.     Singer similarly bribed VAVIC, JANKE, KHOSROSHAHIN, HEINEL and others at USC to designated students as recruited athletes.

61.     For example, Singer directed payments totaling approximately $350,000 to a private soccer club controlled by JANKE and KHOSROSHAHIN.

62.     In exchange for these payments, JANKE and KHOSROSHAHIN designated four children of Singer's clients as recruits for the USC women's soccer team, despite the fact that none of those children played competitive soccer.

63.     Likewise, Singer and his co-conspirators made payments totaling $250,000 to a bank account at USC that funded VAVIC's water polo team.

64.     In exchange for these payments, VAVIC designated two students as recruits for the water polo team, thereby facilitating the students' admission to USC.

65.     Singer also made private school tuition payments for VAVIC's children—under the guise of a fabricated scholarship—via checks drawn on one of the KWF charitable accounts and sent to the school via U.S. Mail, in exchange for VAVIC's commitment to designate Singer's clients as recruits for the USC water polo team in the future.

66.     On multiple occasions between 2014 and 2018, Singer's clients made payments of more than $1.3 million to USC accounts controlled by HEINEL, typically an account for the USC Women's Athletic Board. Singer's clients paid between $50,000 and $100,000 per student by check sent to HEINEL, typically via U.S. mail or a private, interstate commercial carrier.

67.     Singer also entered into a sham consulting agreement with HEINEL, pursuant to which, beginning in July 2018, he directed payments of $20,000 per month to HEINEL personally via checks drawn on one of the KWF charitable accounts and sent to HEINEL via U.S. Mail.

68.     In exchange for the bribe payments, HEINEL helped facilitate the admission of more than two dozen students as recruited athletes, even though many of those students had fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.

11

69. For example, in or about September 2016, HEINEL agreed with Singer to facilitate the purported recruitment of a student, USC Applicant 1, onto the USC women's crew team even though the applicant had no prior crew experience.

70. On or about September 20, 2016, Singer sent an email to JANKE attaching the transcript and test scores of USC Applicant 1. Singer wrote: "to be a coxswain at USC through HEINEL. A profile needs to be completed. Picture coming."

71. In a subsequent email exchange, Singer provided JANKE with a falsified list of regattas to list on USC Applicant 1's profile.

72. On or about October 5, 2016, Singer sent USC Applicant 1's profile, transcripts and scores to HEINEL. The profile included a picture of USC Applicant 1 on a rowing ergometer.

73. On or about October 7, 2016, Singer reported back to JANKE that HEINEL wanted a photo of USC Applicant 1 in a "boat" and asked JANKE to find examples online where it is "tough to see the face."

74. JANKE provided Singer with a number of different options—none of which depicted USC Applicant 1—one of which Singer then sent to HEINEL.

75. On or about October 27, 2016, the USC athletic admissions subcommittee granted USC Applicant 1 conditional acceptance to USC, pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she register with the NCAA and meet all NCAA eligibility requirements.

76. On or about October 29, 2016, Singer sent an email to the father of USC Applicant 1 instructing him to mail a $50,000 check, payable to USC Athletics, to HEINEL at her office address.

77. HEINEL received the check on or about November 2, 2016.

12

78.     On or about March 30, 2017, MASERA sent an email to the parents of USC Applicant 1 attaching an invoice in the amount of $200,000 for their purported "pledge" to KWF.

79.     On or about April 10, 2017, the parents of USC Applicant 1 wired $200,000 into one of the KWF charitable accounts.

80.     Thereafter, HEINEL agreed with Singer to facilitate the purported recruitment of another student, USC Applicant 2, who had no crew experience, onto the women's crew team.

81.     At HEINEL's request, Singer directed the parents of USC Applicant 2 to make a donation of $50,000 to an athletic department account at USC controlled by HEINEL.

82.     In or about December 2017—after USC Applicant 2 was conditionally admitted to USC as a purported recruit for the women's crew team—HEINEL received a $50,000 check from the parents of USC Applicant 2, payable to an athletic department account HEINEL controlled.

83.     On or about February 6, 2018, the parents of USC Applicant 2 caused $200,000 to be wired into one of the KWF charitable accounts.

               iii.     Georgetown

84.     Between 2012 and 2018, Singer paid ERNST bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million. Singer typically made the payments from one of the KWF charitable accounts and sent them to ERNST via U.S. Mail, including in at least one instance to ERNST's residence in Falmouth, Massachusetts.

85.     In exchange for the bribes, ERNST designated at least 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to Georgetown.

86.     For example, on or about August 19, 2015, at Singer's instruction, Georgetown Applicant 1 forwarded to ERNST an email Singer had drafted on his behalf. The email contained falsified information concerning Georgetown Applicant 1's purported tennis abilities. In fact, Georgetown Applicant 1 did not play competitive tennis.

87.     ERNST forwarded the email to a Georgetown admissions officer.

88.     On or about August 21, 2015, ERNST wrote to the same admissions officer to "confirm my usage of three spots" ERNST had been allocated for student admissions to Georgetown, as part of the tennis recruitment process.

89.     ERNST allocated all three spots to the children of Singer's clients, including Georgetown Applicant 1, despite the fact that none of them played competitive tennis.

90.     On or about April 22, 2016, MASERA sent an email to the parents of Georgetown Applicant 1 attaching an invoice in the amount of $400,000 for their purported "private contribution" to KWF.

91.     On or about April 28, 2016, the parents of Georgetown Applicant 1 caused $400,000 to be sent to one of the KWF charitable accounts.

92.     Between approximately September 11, 2015 and August 29, 2016, ERNST received checks totaling $700,000 from one of the KWF charitable accounts.

iv.     UCLA

93.     As another example, in or about 2016, Singer agreed with the parents of an applicant to UCLA ("UCLA Applicant 1") to use bribes to facilitate their daughter's admission to UCLA as a purported soccer recruit, even though she did not play competitive soccer.

94.     On or about April 6, 2016, Singer emailed KHOSROSHAHIN a falsified soccer profile for UCLA Applicant 1.

14

95. On or about May 20, 2016, KHOSROSHAHIN forwarded the soccer profile to SALCEDO.

96. On or about May 24, 2016, the parents of UCLA Applicant 1 emailed Singer their daughter's high school transcript and standardized test scores.

97. Singer forwarded the transcript and test scores to SALCEDO, who forwarded them to a UCLA women's soccer coach.

98. On or about June 28, 2016, the UCLA Student-Athlete Admissions Committee approved UCLA Applicant 1 for "provisional student-athlete admission," pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she successfully completed her senior year of high school and participated on the UCLA team as a student-athlete for a minimum of one full academic year.

99. On or about July 6, 2016, SALCEDO emailed Singer that UCLA Applicant 1 had been provisionally admitted to the university as a student-athlete.

100. On or about July 7, 2016, Singer directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company SALCEDO controlled.

101. On or about July 8, 2016, MASERA emailed a $250,000 invoice to the mother of UCLA Applicant 1. The invoice stated: "Private Contribution – Letter of receipt will be provided upon payment."

102. On or about July 11, 2016, the father of UCLA Applicant 1 emailed Singer asking him to confirm in writing that the $250,000 would be returned in the event his daughter did not receive final admission to UCLA.

103. Singer replied that he would return the money in the event UCLA Applicant 1 did not receive final admission to UCLA.

104.     On or about July 15, 2016, the parents of UCLA Applicant 1 donated 2,150 shares of Facebook, Inc. stock to KWF as a purported charitable contribution.

105.     On or about July 18, 2016, Singer mailed KHOSROSHAHIN a check for $25,000, drawn on one of the KWF charitable accounts.

106.     On or about July 21, 2016, MASERA sent the parents of UCLA Applicant 1 a letter, signed by Singer, acknowledging their purported charitable contribution to KWF of $251,159. The letter stated: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth."

107.     As yet another example, on or about October 24, 2018, Singer mailed SALCEDO a check for $100,000, drawn on one of the KWF charitable accounts.

108.     In exchange for that bribe, SALCEDO designated the son of another one of Singer's clients as a recruit for the UCLA men's soccer team, thereby facilitating his admission to UCLA, despite the fact that the student did not play competitive soccer.

109.     Following the student's admission to UCLA, Singer again paid KHOSROSHAHIN $25,000 for facilitating the transaction.

     v.    Wake Forest

110.     In or about 2017, Singer directed $100,000 from one of the KWF charitable accounts to be sent to FERGUSON, including a $10,000 check to the Wake Forest Deacon Club, a $40,000 check to Wake Forest Women's Volleyball, and a $50,000 check to a private volleyball camp FERGUSON controlled.

111.     In exchange for this money, FERGUSON agreed to designate the daughter of one of Singer's client—who had previously applied to Wake Forest and been placed on the wait list— as a recruit for the women's volleyball team, thereby facilitating her admission to the university.

### vi. Stanford

112.   In or about the summer of 2017, John Vandemoer, the head coach of the Stanford sailing team, agreed to designate the child of one of Singer's clients ("Stanford Applicant 1") as a recruit for the Stanford sailing team, in exchange for a payment to Stanford sailing.

113.   In support of the student's application, JANKE created a student-athlete "profile" that was submitted to Stanford, and that falsely suggested that Stanford Applicant 1 was a competitive sailor.

114.   In May 2018, after Stanford Applicant 1 deferred his application to Stanford for one year, Singer directed a payment of $110,000 from one of the KWF charitable accounts to the Stanford sailing program in exchange for Vandemoer's agreement to designate Stanford Applicant 1 as a sailing recruit in the following year's recruitment cycle.

115.   In or about the summer of 2018, after Stanford Applicant 1 decided to attend a different university, Vandemoer agreed with Singer to use that same recruiting spot for the child of another one of Singer's clients ("Stanford Applicant 2"), in exchange for a $500,000 payment to the Stanford sailing program.

116.   In support of the student's application, Singer, together with others, created documents falsely indicating that the student was a competitive sailor, although the student in fact had minimal sailing experience.

117.   Although that student ultimately did not apply to Stanford, Singer directed a payment of $160,000 from one of the KWF charitable accounts to the Stanford sailing program.

118.   Vandemoer agreed with Singer that the payment would serve as a "deposit" for a future student's purported recruitment.

vii.   U-Texas

119.   In or about 2015, FOX introduced Singer to a tennis coach at U-Texas for the purpose of facilitating the admission of a student to the university, through bribery, as a purported athletic recruit.

120.   Singer paid the coach approximately $100,000.

121.   In exchange for the bribe, the U-Texas coach designated the son of one of Singer's clients, who did not play tennis competitively, as a recruit for the university's tennis team, thereby facilitating his admission to U-Texas.

122.   Singer paid FOX $100,000 for assisting with the bribe transaction.

viii.   USD

123.   FOX arranged similar bribes, on two occasions, with a varsity sports coach at USD.

124.   In or about 2016, in exchange for a bribe paid through FOX, the coach designated the son of one of Singer's clients, who did not play the sport, as a recruit for the university's team, thereby facilitating his admission to USD.

125.   Singer paid FOX approximately $100,000 for arranging the bribe.

126.   In or about 2017, in exchange for the promise of an additional bribe, the coach designated another student as a recruit to manage the coach's team, thereby facilitating her admission to USD.

127.   Although the student ultimately decided not to attend USD, Singer paid the USD coach $10,000 for his help in securing her admission.

COUNT ONE
Racketeering Conspiracy
(18 U.S.C. § 1962(d))

The Grand Jury charges:

128.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-127 of this

Indictment.

129.     From in or about 2011, and continuing through February 2019, in the District of

Massachusetts and elsewhere, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (3) LAURA JANKE,
> (4) ALI KHOSROSHAHIN,
> (5) STEVEN MASERA,
> (6) MIKAELA SANFORD,
> (7) MARTIN FOX,
> (8) IGOR DVORSKIY,
> (9) LISA "NIKI" WILLIAMS,
> (10) WILLIAM FERGUSON,
> (11) JORGE SALCEDO, and
> (12) JOVAN VAVIC,

being persons associated with or employed by The Key Enterprise, an enterprise engaged in, and

the activities of which affected interstate and foreign commerce, conspired with others known and

unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to

conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise

through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections

1961(1) and (5); consisting of multiple acts indictable under:

a.   Title 18, United States Code, Section 1341 (relating to mail fraud);

b.   Title 18, United States Code, Sections 1341 and 1346 (relating to honest services mail fraud);

c.   Title 18, United States Code, Section 1343 (relating to wire fraud);

19

d. Title 18, United States Code, Sections 1343 and 1346 (relating to honest services wire fraud); and

e. Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

130. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## RACKETEERING FORFEITURE ALLEGATION
### (18 U.S.C. § 1963(a))

The Grand Jury further finds that that:

131. Upon conviction of the offense in violation of Title 18, United States Code, Section 1962(d), set forth in Count One of this Indictment, the defendants,

(1) GORDON ERNST,
(2) DONNA HEINEL,
(3) LAURA JANKE,
(4) ALI KHOSROSHAHIN,
(5) STEVEN MASERA,
(6) MIKAELA SANFORD,
(7) MARTIN FOX,
(8) IGOR DVORSKIY,
(9) LISA "NIKI" WILLIAMS,
(10) WILLIAM FERGUSON,
(11) JORGE SALCEDO, and
(12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a. any interest the defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise established, which the defendant operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c. any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

a. Chevy Chase country club membership, as owned by Ernst;
b. 25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;
c. Vanguard account ending in x9912, as owned by Ernst;
d. $2,719,963.78, to be entered in the form of a forfeiture money judgement against Ernst;
e. $160,000, to be entered in the form of a forfeiture money judgement against Heinel;

f.  $356,047, to be entered in the form of a forfeiture money judgment against Khosroshahin and Janke;

g.  $75,000, to be entered in the form of a forfeiture money judgment against Khosroshahin;

h.  $7,750, to be entered in the form of a forfeiture money judgment against Janke;

i.  $429,300, to be entered in the form of a forfeiture money judgment against Fox;

j.  $198,000, to be entered in the form of a forfeiture money judgment against Dvorskiy;

k.  $5,000, to be entered in the form of a forfeiture money judgment against Williams;

l.  $50,000, to be entered in the form of a forfeiture money judgment against Ferguson;

m.  $200,000, to be entered in the form of a forfeiture money judgment against Salcedo; and,

n.  $119,445, to be entered in the form of a forfeiture money judgment against Vavic.

132.    If any of the property described in Paragraph 131, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(m), as a result of any act or omission of the defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 131 above.

All pursuant to Title 18, United States Code, Section 1963.

A TRUE BILL

_____
FOREPERSON

_____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: MARCH 5, 2019
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK
3/5/19

SEALED