**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA | ) | |
|  | ) | |
| v. | ) | Criminal No. 19-CR-10081 |
|  | ) | |
| GORDON ERNST, *et al.*, | ) | *Leave to file excess pages granted on* |
|  | ) | *February 14, 2020 (Dkt. No. 387)* |
| Defendants. | ) | |
| _____ | ) | |

**DONNA HEINEL MEMORANDUM OF LAW IN REPLY TO GOVERNMENT**
**OPPOSITION TO MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................1

II.     THE GOVERNMENT IS WRONG THAT IT HAS ADQUATELY PLED A RICO
        CONSPIRACY (COUNT 1) ......................................................................................1

        A.  The government is incorrect that the only relationship that must be pled is one between
            the entities ...................................................................................................................1

        B.  The government is incorrect that a rimless hub-and-spoke conspiracy is sufficient. ......3

            1.  Count 1 fails to plead that Heinel knew the Key Enterprise extended beyond her
                individual role ........................................................................................................6

            2.  Count 1 fails to plead that Heinel agreed with her co-defendants to pursue the same
                criminal objective ..................................................................................................7

        C.  The government is incorrect that association with the enterprise does not require
            operation or management ..............................................................................................12

III.    THE GOVERNMENT IS WRONG THAT THE CONSPIRACY TO COMMIT
        MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE
        FRAUD COUNT IS A SINGLE CONSPIRACY WITH MULTIPLE
        OBJECTIVES (COUNT 2) ......................................................................................15

IV.     THE GOVERNMENT IS INCORRECT THAT THE FEDERAL PROGRAM
        BRIBERY COUNT ADEQUATELY ALLEGES A QUID PRO QUO
        (COUNT 3) ..............................................................................................................17

V.      THE GOVERNMENT IS WRONG THAT IT HAS PLED A MONEY OR
        PROPERTY RIGHT IN COUNTS 2, 11 THROUGH 16 AND 21 ...........................19

        A.  Admissions slots are not equivalent to diplomas and do not constitute property under
            the mail and wire fraud statutes ...................................................................................19

        B.  The mail and wire fraud statutes do not apply here because the schools did not suffer
            economic harm or lose the benefit of their bargain .......................................................21

VII.    CONCLUSION ........................................................................................................21

CERTIFICATE OF SERVICE .................................................................................................22

## I.   INTRODUCTION

The government's Opposition fails to refute or rebut the legal arguments made in support of Heinel's Motion to Dismiss. As to Count 1, rather than rebutting the argument that the association-in-fact enterprise as pled does not comply with *Boyle*, the government instead argues that it must only allege a relationship and common purpose between the two entities comprising the enterprise. This is incorrect. The government's argument that resolution of this issue should be left to trial is likewise incorrect. An indictment must be "sufficiently specific both to advise the defense of what it must be prepared to defend against and to allow recognition of a double jeopardy problem in future cases, and contain[] facts that fall within the scope of the RICO statute as a matter of law." *United States v. Bergrin*, 650 F.3d 257, 269 (3d Cir. 2011). Anything less requires dismissal. *See id.*

The government's Opposition on the remaining counts is likewise unpersuasive. The conspiracy to commit mail and wire fraud and honest services mail and wire fraud charged in Count 2 is duplicitous and cannot simply be recast as a single conspiracy with multiple objectives. The federal programs bribery offense charged in Count 3 fails to allege a quid pro quo. And as to the conspiracy and substantive mail and wire fraud and honest services mail and wire fraud charges (Counts 2, 11 through 16 and 21), the government has not cited any authority establishing that admissions to universities qualifies as "money or property under the mail and wire fraud statutes nor has it sufficiently alleged any contemplated economic or other articulable harm as required.

These failures of pleading violate Rule 12(b) and require Counts 1, 2, 3, 11 through 16 and 21 be dismissed. Fed. R. Crim. P. 12(b)(3)(B)(iv)-(v).

## II.   THE GOVERNMENT IS WRONG THAT IT HAS ADQUATELY PLED A RICO CONSPIRACY (COUNT 1)

### A.   The government is incorrect that the only relationship that must be pled is one between the entities.

Count 1 fails to plead and/or give notice of the relationships among those associated with

the enterprise as required by *Boyle v. United States*, 556 U.S. 938, 940 (2009).[1] An indictment that pleads an association-in-fact enterprise but does not satisfy the *Boyle* requirements must be dismissed. *See Bergrin*, 650 F.3d at 269 (holding that an indictment must allege facts that satisfy the *Boyle* enterprise requirements, including purpose, relationships among the defendants and longevity after the defendants moved to dismiss pursuant to Rule 12(b) both the substantive and conspiracy RICO counts); *United States v. Norwood*, No. 12-CR-20287, 2013 WL 5965328, at *4 (E.D. Mich. Nov. 8, 2013) (examining the alleged enterprise's compliance with *Boyle* in ruling on Defendant's Rule 12(b) motion to dismiss).

In the government's desperate attempt to charge a disparate group of defendants as part of a sole RICO Conspiracy, the government tries to circumvent the *Boyle* requirements of an association-in-fact enterprise by arguing that it must only allege a relationship between the two entities comprising the enterprise – the Key and the Key Worldwide Foundation ("KWF"). Under the RICO statute, only those persons employed by *or associated with* the enterprise are criminally liable. 18 U.S.C. §§ 1962(c), (d). Yet, the government takes the position that it does not need to establish relationships among those associated with the enterprise – the charged defendants.[2] *Id.*

---

[1] An association-in-fact enterprise, as alleged here, requires "a purpose, ***relationships among those associated with the enterprise***, and longevity sufficient to permit those associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946 (emphasis added); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) (RICO requires an (1) enterprise in which the "various associates function as a continuing unit" and (2) racketeering acts alleged to have been "committed by the participants *in* the enterprise." (emphasis added)).

[2] In support of its position, the government cites *London* and *Hosseini* to demonstrate that it has adequately alleged the only relationship requirement necessary as between the Key and KWF. (Gov. Opp. at 10 (*citing United States v. London*, 66 F.3d 1227, 1244 (1st Cir. 1995); *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012).) In *London*, decided 14 years before *Boyle*, the defendant argued that the enterprise did not have a common or shared purpose and that the enterprise was not distinct from the defendant. *London*, 66 F.3d at 1243. The case has nothing to do with whether a relationship must be established only between the entities named in the indictment or whether a relationship with those associated with the enterprise must be established. (*see id.*) The second citation to *Hosseini* is not inapposite to Heinel's position in her opening brief: the court embraced the *Boyle* requirements for an association-in-fact enterprise and found that because there was sufficient evidence that the RICO enterprise possessed a "purpose (profiting through unreported cash auto sales to drug dealers), relationships ([the codefendant's] own close personal relationship, as well as [an] interlocking relationship [between the auto dealerships they owned]), and longevity (the scheme lasted at least a decade),"

(Gov. Opp. at 10; Superseding Indictment ("SI"), ¶15-17.) The government is wrong.

The government cannot have its cake and eat it too. Either the charged defendants are alleged to have been associated with the enterprise as required by the statute, or they are not. *See* 18 U.S.C. §§ 1962(c), (d).[3] If they are ***not*** alleged to have been associated with the enterprise, then there is no RICO Conspiracy. *See id.* Based on the government's logic, the only members of the enterprise are Singer, Masera and Sanford. (Gov. Opp. at 10.) If none of the remaining defendants are alleged to be associated with the enterprise, then Count 1 must be dismissed as to all of those defendants – Heinel, Ernst, Williams, Ferguson, Salcedo and Vavic. If the remaining defendants are alleged to have been associated with the enterprise, and the SI appears to allege that they are – "the defendants, Singer, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy" – then the government must comply with *Boyle* and give notice in the SI of the relationships among those associated with the enterprise. (SI, ¶ 38.) 556 U.S. at 940. *See also Bergrin*, 650 F.3d at 269 (holding that an indictment must allege facts that satisfy the *Boyle* enterprise requirements, including purpose, relationships among the defendants and longevity after Defendants moved to dismiss pursuant to Rule 12(b) both the substantive and conspiracy RICO counts). The government has not done so. Count 1's deficient enterprise warrants dismissal. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010).

**B. The government is incorrect that a rimless hub-and-spoke conspiracy is sufficient**.

The government argues that "Congress [] 'replac[ed] the inadequate 'wheel' and 'chain' rationales with a new [conspiratorial] concept: the enterprise.'" (Gov. Opp. at 12-13 (quoting *United States v. Elliott*, 571 F.2d 880, 902-03 (5th Cir. 1978)).) But this argument is refuted by the fact that courts have continued to impose the wheel concept when examining RICO Conspiracies

---

the evidence was easily sufficient to establish a RICO enterprise. *Hosseini*, 679 F.3d at 558. The court did not discuss the enterprise alleged in the indictment but instead based its holdings on the evidence presented at trial with regard to the defendants and their businesses. *Id.*

[3] Since Heinel was not alleged to have been employed by the Key Enterprise, Heinel's brief only focuses on the associational element of 18 U.S.C. §§ 1962(c), (d).

and, in fact, the Supreme Court itself imposed a similar limitation when it decided *Boyle* in 2009. 556 U.S. at 946. (See also Gov. Opp. at 15 (conceding that civil courts have relied on the traditional conspiratorial concept of a 'wheel' to inform assessment of whether a group of individuals and/or entities constitutes an association-in-fact enterprise under *Boyle*.")) The Supreme Court does not mince words. It specifically held that an association-in-fact enterprise requires "relationships *among* those associated with the enterprise" – language pulled directly from the statute – it did not hold that relationships must only be alleged between the entities comprising the association-in-fact enterprise or that relationships must only be established between an associate and the enterprise. *Boyle*, 556 U.S. at 946 (emphasis added); see also 18 U.S.C. § 1962(c). This crucial distinction is ignored by the government.

The government does not cite a single post-*Boyle* decision holding that a rimless hub-and-spoke structure can satisfy the common purpose and relationship elements of a RICO enterprise. By contrast, Heinel and her co-defendants cited eight cases[4] in their motions – and here cite an additional 11 pre- and post-*Boyle* cases[5] – all holding that such a structure does not constitute a

---

[4] See Gov. Opp. at 15. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327; *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013); *In re Pharma. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183 (D. Mass. 2003); *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173–74 (D. Mass. 2003); *New York Auto. Ins. Plan.*, No. 97 Civ. 3164(KTD), 1998 WL 695869, at *5 (S.D.N.Y. Oct. 6, 1998); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)); *Ezell v. Lexington Ins. Co.*, 286 F. Supp. 3d 292, 298 (D. Mass. 2017); *Gov't Emps. Ins. Co. v. Analgesic Healthcare, Inc.*, Civ. No. 16-11970-RGS, 2017 WL 1164496, at *2 (D. Mass. Mar. 28, 2017).

[5] *See, e.g.*, *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 433 F. Supp. 2d 172, 182–83 (D. Mass. 2006) (finding a "hub-and-spoke model with Defendant at the center managing several independent relationships" to be insufficient to establish a RICO enterprise "because there [was] no 'rim' to connect the spokes of the wheel"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183–84 (D. Mass. 2003) (holding that "a doctor in Massachusetts and a doctor in Minnesota [were not] part of the same RICO enterprise" simply because both allegedly took payments in exchange for prescriptions and were "aware of the involvement of other similarly-situated providers"); *Flagg v. First Premier Bank*, 257 F. Supp. 3d 1351, 1358–59 (N.D. Ga. 2017) (noting that alleged enterprise was "defective by its sheer scope and imprecision"); *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *4–7 (S.D.N.Y. Aug. 4, 2016) (examining the precedent and concluding that "something more than parallel conduct" must be alleged); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 134–35 (E.D.N.Y. 2010); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 306–07 (S.D.N.Y. 2010)

RICO enterprise. The government's failure to engage with these decisions on the merits speaks volumes.

Instead of engaging with these cases, the government argues that Heinel's reliance on civil RICO precedent "has no bearing on the analytically distinct question of the nature of the agreement required to demonstrate a conspiracy to further the affairs of a RICO enterprise." (Gov. Opp. at 15.) This argument is without merit. As the government would be remiss to ignore, the First Circuit has recognized that "it is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability." *United States v. Shifman*, 124 F.3d 31, 35 n. 1 (1st Cir. 1997). And while the return of an indictment by a grand jury distinguishes a criminal case from a civil complaint, Heinel's arguments do not implicate that difference. Rather, Heinel references civil cases in support of the necessity to plead facts that demonstrate a rim connecting a hub and spoke conspiracy. *See City of New York v. Chaves*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013) (enumerating the "ongoing organization," "function[ing] as a continuing unit," and have "a common purpose" as elements that "a civil plaintiff *or criminal prosecutor*" must establish (emphasis added)).

The government asserts that a lack of criminal RICO precedent dismissing a purported hub-and-spoke enterprise should give the Court pause in granting Heinel's motion. (See Gov. Opp. at 15.) But the inference should go the other way – the absence of cases is better explained by the fact that criminal prosecutors have not historically charged a rimless hub-and-spoke arrangement under RICO. Since the government has not alleged relationships among those associated with the enterprise, Heinel is deprived of fair notice of the charges against which she must defend.

//

---

(noting that an association-in-fact required "something more than parallel conduct of the same nature and in the same time frame by different actors in different locations"); *Valcom, Inc. v. Vellardita*, 2014 WL 1628431, at *6–7 (D.N.J. Apr. 23, 2014); *Mega Concrete, Inc. v. Smith*, 2011 WL 1103831, at *8–10 (E.D. Pa. Mar. 24, 2011); *Neiman Marcus Grp., Inc., v. Dispatch Transp. Corp.*, 2011 WL 1142922, at *7 n.11 (S.D.N.Y. Mar. 17, 2011); *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449–51 (S.D.N.Y. 2007); *Vulcan Golf, LLC v. Google Inc.*, 2008 WL 2959951, at *5 n.2 (N.D. Ill. July 31, 2008) (citing *In re Lupron*, 295 F. Supp. 2d at 173–74).

1. <u>Count 1 fails to plead that Heinel knew the Key Enterprise extended beyond her individual role.</u>

As the government concedes, Count 1 must allege that a RICO Conspirator "kn[ew] the general nature of the enterprise and that *the enterprise extended beyond [her] individual role[].*"(Gov. Opp. at 14 (emphasis added) (citing *United States v. Rastelli*, 870 F.2d 822, 827-28 (2d Cir. 1989)).) *See also United States v. Viola*, 35 F.3d 37 (2d Cir. 1994) (abrogated on other grounds) (in order to demonstrate  defendant's knowledge of RICO Conspiracy, it is sufficient for the government to show that the defendant knew the general nature of enterprise and "knew that the enterprise extended beyond his individual role")*; United States v. Pepe*, 747 F.2d 632, 660 (11th Cir. 1984) (a RICO Conspiracy requires that "each defendant conspired to commit the substantive RICO offense and was aware that others had done likewise."); *Elliott*, 571 F.2d at 903 (for a RICO Conspiracy, each defendant must know that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity and that the defendants each knew "that the enterprise was bigger than his role in it, and that others unknown to him were participating in its affairs.")

There is no allegation in the SI that Heinel knew the enterprise extended beyond her individual role. The SI alleges that Singer conspired with Janke to fabricate athletic profiles which Singer sent to Heinel (see e.g., SI, ¶¶ 65-69), but there is no allegation that Heinel was aware of Singer and Janke's conspiracy. Nor is there any allegation that the alleged purpose of admitting "students … as recruited athletes with little or no regard for their athletic abilities" (SI, ¶ 36) extended beyond Heinel's individual role at USC. And even though Heinel is alleged to have received donations to USC from the parents of applicants once they were conditionally admitted, there is no allegation that Heinel was aware the parents knew the athletic profiles were false (or any indication that *Heinel* knew the athletic profiles were falsified for that matter). Further, receipt of donations is not a bribe. *See e.g. Bizzack*, No. 1:19-cr-10222-DPW-1 (Tr. of Sentencing at 15:23-24) (Woodlock, J.) ("That's not a bribe, is it?  It's received by USC."); *see also United States* v. *Choy*, 309 F.3d 602, 606 (9th Cir. 2002) (reversing convictions because, although

payments "enabled [official] to process shipments, [] they did nothing for [him]."). (See SI, ¶¶ 59-85.) Instead, the SI makes clear that Singer kept Heinel siloed from the others he was working with. (See id., ¶¶ 65-69.)

There is also no allegation that Heinel was aware of Singer's alleged involvement with Gordon Ernst at Georgetown, or William Ferguson at Wake Forest, or Jorge Salcedo at UCLA, or even Jovan Vavic, Laura Janke or Ali Khosroshahin, who were at one time or another employed at the same university as Heinel (USC). Nor is there any allegation that Heinel was aware of anything or anyone having to do with the standardized test scheme. In fact, the SI itself makes clear how siloed each of these defendants were in its clean separation of the cheating on the standardized test scheme (id., ¶¶ 39-48) and the student-athlete recruitment scheme (id., ¶¶ 49-117), which is further broken down by each school, with no allegation that Heinel conspired with or was even aware of the other defendants. (Id.) Because Count 1 does not allege that Heinel had any knowledge whatsoever that the enterprise extended beyond her individual role to others at her own university, to others at other universities, or to a standardized test scheme, it is deficient and must be dismissed.

2. Count 1 fails to plead that Heinel agreed with her co-defendants to pursue the same criminal objective.

Despite the government's arguments to the contrary, the conspirator-defendants must be connected in their pursuit of a common purpose: a RICO Conspiracy consists of a group of individuals who "agree to pursue the **same criminal objective**" and carry it out "in [a] virtually identical manner, [with] an **overlapping of defendants**." *Salinas v. United States*, 522 U.S. 52, 63-64 (2009); *United States v. Maker,* 751 F.2d 614, 625 (3d Cir.1984), *cert. denied,* 472 U.S. 1017 (1985) (liability for RICO Conspiracy requires a single scheme evidenced by "a common goal, operations carried out in virtually identical manner, and an overlapping of defendants."). *See also United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988) (("[p]roof of a single conspiracy requires evidence that the alleged coconspirators "agreed on a 'common purpose' that sufficed to render their activities 'a single enterprise.'" (citing *United States v. Heinemann*, 801 F.2d 86, 92

7

(2d Cir.1986)); *Elliott*, 571 F.2d at 902-03 (finding that while it is irrelevant that defendants participated in enterprise's affairs through different, even unrelated crimes, the court still must "look for agreement on an overall objective."). (See generally Gov. Opp. at 8-15.) Failure to do so warrants dismissal. *See Bergrin*, 650 F.3d at 270 (reviewing face of indictment to determine whether the alleged schemes had "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events'" in order to determine whether indictment should be dismissed pursuant to Rule 12(b)(3)) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 244 (1989)).

United States v. Pinson* is illustrative. 860 F.3d 152 (4th Cir. 2017). In *Pinson*, the defendant was alleged to have been involved in at least two separate conspiracies comprising four different criminal ventures. *Id.* at 162. "In each conspiracy, only two members (including Pinson) conspired to commit the criminal acts, and Pinson [was] the only member who overlap[ed] both conspiracies [such that t]he conspiratorial tie between the [] ventures boil[ed] down to just two members: Pinson and [another defendant]." *Id.* Since "Pinson [wa]s the only member common to all four ventures[,]" the court held that the government had not demonstrated "a single conspiracy in which each conspirator shared '***the same criminal objective***.'" *Id.* (citing *Salinas*, 522 U.S. at 63-64 (emphasis added)). "Although conspirators need not know the full scope nor membership of a conspiracy, nor need they participate in all of its activities, they must at least have a 'single-mindedness to achieve a particular goal.'" *Id.* (citing *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005). On the contrary, the *Pinson* Court held, "the cast of characters [] was of at least two minds, if not more." *Id.*

Here, the 80 paragraphs of Acts in Furtherance alleged for Count 1 fail to establish that Singer and the defendants pursued the same criminal objective. As in *Pinson*, the SI here similarly alleges distinct and separate conspiracies, with distinct objectives, and with Singer and Masera as the only individuals to overlap the various conspiracies – rather than a "single conspiracy in which each conspirator shared 'the same criminal objective'" as required for a section 1962(d) charge. *Pinson*, 860 F.3d at 162 (citing *Salinas*, 552 U.S. at 63-64). (See Dkt. No. 262 at 6-14.) Instead,

the SI alleges four distinct purposes of the conspiracy – [a] to facilitate cheating on college entrance exams; [b] to facilitate the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities; [c] to enrich the defendants and Singer personally; and [d] to provide additional funds for designated accounts associated with university athletic programs controlled by the defendants." (SI, ¶ 36.) The Acts in Furtherance appear to be broken down in support of the different purposes with no unified criminal objective. At best, the four "purposes" of the racketeering conspiracy alleged in the SI show two separate conspiracies, each a separate endeavor embarked upon by Singer: one involving the standardized tests and one involving the student athlete admissions. (Id. at ¶¶ 39-117.)

The cheating on the standardized test scheme comprises paragraphs 39 through 48, which support purpose (a) (to facilitate cheating on college entrance exams) and involves Dvorskiy, Masera, Riddell, Williams, Fox, and Singer. (Id. at ¶¶ 39-48.) Entirely separate from the cheating on the standardized test scheme is the student-athlete recruitment scheme alleged in paragraphs 49 through 117 which supports purposes (b) to facilitate the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities; and (d) to provide additional funds for designated accounts associated with university athletic programs controlled by the defendants (Id. at ¶¶ 49-117.) Notably, the criminal objectives of these two schemes are entirely separate, with no overlap. The SI does not allege any facts to support the argument that these conspiracies shared the same overall objective. Furthermore, the SI does not allege any co-conspirator other than Singer or Masera who were aware of or participated in both schemes. (See id.) This is the extent of the "overlap of defendants." *Maker,* 751 F.2d at 625. The parties to and purpose of each conspiracy are otherwise entirely separate, as in *Pinson.* 860 F.3d at 162. As a result, the SI does not allege a single conspiracy in which each conspirator shared the same criminal objective. *Id.*

Complicating matters further, the SI improperly alleges not just two, but numerous conspiracies in the same indictment, all with separate criminal objectives. The student-athlete scheme is further divided by each university. (SI, ¶¶ 52-117.) Singer's activities with Ernst, Heinel,

Ferguson and Vavic are all entirely siloed. Each alleged scheme at each university with regard to each individual defendant supports a purpose specific to that particular defendant at his or her particular university to: (b) facilitate the admission of students to *an* elite university as recruited athletes, with little or no regard for their athletic abilities or to (d) provide additional funds for designated accounts associated with *a* university athletic *program* controlled by *a defendant*. (Id.) None of these individuals are part of a "group" or are "working together," or are alleged to have had any knowledge of other universities or the involvement of allegedly similarly situated individuals. The SI does not allege a relationship between any of these coach and administrator defendants beyond the one with Singer, or a nexus between their relationship and the larger RICO Conspiracy. The SI also fails to establish that the coach or administrator defendants' purposes extended beyond their own university, or that they were coconspirators with anyone other than Singer. Each is alleged to have been involved only in his or her own siloed conspiracy, and each allegedly defrauded a different university. And in fact, only the Acts in Furtherance alleged for Heinel at USC, Salcedo at UCLA and Ferguson at Wake Forest lend support for the second of these objectives, (d) (providing additional funds for designated accounts associated with *a* university athletic program). (Id.) There is no allegation that the other codefendants pursued this criminal objective thus further siloing the defendants in their unique pursuits. (Id.)

Purpose (c) (to enrich the defendants and Singer personally) is disingenuous. As the court held in *Pinson*, rather than alleging a common purpose that transcends the numerous alleged conspiracies, purpose (c) further reinforces the fact that Count 1 fails to allege "an association-in-fact enterprise consisting of 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" 860 F.3d at 162. One party enriched by her own individual acts is not the same as that party acting for the enrichment of the enterprise. "The purpose of each venture [] was to enrich its members, yet any fruits of these ventures accrued only to members of each venture. Any illicit profits did not carry over to the members of the other ventures. Indeed, given the lack of overlapping members between the ventures, any such profits *could not* carry over." *Id.* (emphasis in original).

> To be sure, a RICO enterprise need not have a rigid structure and its members may 'engage in spurts of activity punctuated by periods of quiescence,' but it must at least consist of 'an ongoing organization' that 'function[s] as a continuing unit.' Quite the reverse, the [numerous] ventures here involve[] different memberships, methods, and motives, and thus lack[] the 'common purpose' and relationships among its associates necessary to establish a RICO enterprise.

*Id.* (citing *Boyle*, 556 U.S. at 945, 948 (quoting *Turkette*, 452 U.S. at 583.)

The government contends that the Fifth Circuit's pre-*Boyle* decision in *Elliott* supports its theory that it need not plead relationships or a common purpose joining all of the charged defendants. 571 F.2d 880. (Gov. Opp. at 12-13.) However, rather than supporting the government's theory, *Elliott* underscores the importance of ensuring a properly pled enterprise which does just that. *Id.*

The defendants in *Elliott* argued that their indictment alleged a single RICO Conspiracy, but that "the government's evidence at trial proved the existence of several conspiracies, resulting in a variance." 571 F.2d at 900. The Fifth Circuit explained that RICO established a new substantive offense – conducting or participating in the affairs of an enterprise by agreeing to commit two or more predicate crimes – which could serve as the object of a single conspiracy. *Id.* at 902. Critical to that new offense was *the existence of an enterprise*. As the *Elliott* Court cautioned, "we still must look for agreement on an overall objective," i.e., of the "enterprise." *Id.* at 903.

Like the Fifth Circuit in *Elliott*, the First Circuit has recognized that the enterprise element is essential to maintaining reasonable limits on the scope of RICO liability. *See, e.g., Ryan v. Clement*, 901 F.2d 177, 180 (1st Cir. 1990 (Breyer, J.) ("Requiring that members of an enterprise have a 'common purpose' limits the potentially boundless scope of the word 'enterprise'" and "*Elliot*[*t*] … is not to the contrary" (citing *United States v. Bledsoe*, 674 F.2d 647, 664-65 (8th Cir.

1982), and *Elliot*, 571 F.2d 880)).[6,7] This is one of the fatal issues with Count 1, which alleges no united, common purpose or objective. (See Dkt. No. 332 at 6-10.)

Because none of the Acts in Furtherance describe relationships sufficient to allege a coordination of efforts among the various coaches, administrators, exam proctors, etc. with whom Heinel purportedly conspired or define an objective common to all, Count 1 must dismissed for failure to state an offense.

## C. The government is incorrect that association with the enterprise does not require operation or management.

The SI also fails to sufficiently allege that Heinel participated in the conduct of the enterprise's affairs as required for a RICO Conspiracy charge. 18 U.S.C. §§ 1962(c), (d). In order for Heinel to "have taken part in, or associated with the conduct of an enterprise, [she] must have had some part in directing those affairs of the enterprise." *United States v. Cianci*, 378 F.3d 71, 94 (1st Cir. 2004) (citing 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 177-78 (1993)). In other words, "in order for [Heinel] to have been an associate of the RICO enterprise, h[er] participation needs to have had 'an element of direction' of the enterprise's affairs. *Id* at 95 (citing *Reves*, 507 U.S. at 178; *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994).

In *Reves*, purchasers of demand notes from a farmer's cooperative brought a RICO action against the cooperative's accountants for failing to inform the cooperative's Board of Directors that the cooperative was arguably insolvent. 507 U.S. at 185. After a thorough examination of the

---

[6] All of the out-of-Circuit cases cited by the government in support of *Elliott* (Gov. Opp. at 13) are pre-*Boyle* and still required a finding of an "'agreement on an overall objective,' [] that 'each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.'" *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991) (citing *United States v. Valera,* 845 F.2d 923 (11th Cir.1988); *see also Friedman*, 854 F.2d at 562–63; *United States v. Tille*, 729 F.2d 615, 619 & n.1 (9th Cir. 1984).

[7] The First Circuit cases cited by the government in support of *Elliott* are also both pre-*Boyle*. They also dealt with entirely distinct issues from those here and do not include discussion of the requisite common purpose. (Gov. Opp at 13 citing *United States v. Turkette*, 656 F.2d 5, 8 (1st Cir. 1981), *United States v. Tashijian*, 660 F.2d 829, 834 (1st Cir. 1981).)

statute and the Congressional history, the Court determined that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must participate in the operation or management of the enterprise itself." *Id.* In support of its holding, the Court reasoned that a RICO charge "cannot be interpreted to reach to complete 'outsiders' because liability depends on showing that the defendants conducted or participate in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 184 (emphasis in original). Because the accountants in *Reves* were outsiders who did not participate in the operation or management of the cooperative, the Court affirmed the lower court's grant of summary judgment in the defendants' favor. *Id.* at 170.

While the government is correct that the court in *Rodriguez-Torres* declined to address whether a different standard should apply for RICO Conspiracy cases rather than substantive RICO cases (Gov. Opp. at 20 (citing *United States v. Rodriguez-Torres*, 939 F.3d 16, 28 n. 6 (1st Cir. 2019)), the First Circuit has yet to make a distinction between sections 1962 (c) and (d) on this point, and has used the *Reves* "operation or management" test to determine whether a defendant associated with the enterprise interchangeably between the two subsections. *See e.g.*, *Rodriguez-Torres*, 939 F.3d at 28 (RICO Conspiracy – still nonetheless using the *Reves* "operation or management" language in determining participation in an enterprise); *Cianci*, 378 F.3d at 94 (RICO Conspiracy); *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) (substantive RICO); *Oreto*, 37 F.3d at 750 (substantive RICO). Thus, the standard for sections 1962(c) and (d) is the same in the First Circuit.

Similar to the defendants in *Reves*, Heinel was an enterprise outsider. In fact, the only mention whatsoever regarding the Key Enterprise as it relates to Heinel is that Heinel personally received "checks drawn on one of the KWF charitable accounts." (SI, ¶ 60.) Mere receipt of a check from one of the two entities alleged to form a RICO enterprise is grossly insufficient to charge Heinel with RICO Conspiracy. There is no indication she had any "element of direction" over the Key Enterprise's affairs or even knew about their related activities. *Reves*, 507 U.S. at 184; *Marino*, 277 F.3d at 33. And even if the enterprise "only acts through its members" (Gov.

Opp. at 19), Heinel's purported conspiracy with Singer is insufficient to allege that she played some part "in directing the affairs of the [Key] [E]nterprise." *Reves*, 507 U.S. at 184. Rather, all that has been alleged is Heinel's participation in her "*own* affairs." *Id.* (emphasis in original).[8] (See SI, ¶¶ 59-85.)

The government attempts to foreclose the *Reves* "operation or management" test in its citation to *Shifman*, which has largely fallen into disfavor in the First Circuit. (Gov. Opp. at 21 (citing *Shifman*, 124 F.3d at 36 (quoting *Oreto*, 37 F.3d at 750)).) The *Shifman* Court, interpreting the *Reves* test as requiring that a defendant be "'plainly integral to carrying out' the enterprise's activities" to be criminally liable under 18 U.S.C. § 1962(c), based its holding on the fact that the Supreme Court in *Reves* was assessing civil RICO liability and that, under *Oreto*, a different standard applied for criminal cases. 124 F.3d at 36 (citing *Oreto*, 37 F.3d at 750). The *Oreto* Court, however, distinguished *Reves* not because it was a civil case, but because "*Reves* [was] a case about the liability of *outsiders* who may assist the enterprise's affairs." 37 F.3d at 750. In *Oreto*, the defendants challenging their RICO conviction were employees of the enterprise who "were plainly integral to carrying out [the enterprise's activities] and not outsiders as in *Reves*." *Id.* It is from this language that the *Shifman* Court interpreted a relaxed standard to the "operation or management" test. 124 F.3d at 36. However, in *Oreto* and *Shifman*, the defendants were either employees of the enterprise or were so integral to the enterprise that "but for" the defendant's conduct, the illegal actions would not have occurred. *Oreto*, 37 F.3d at 750; *Shifman*, 124 F.3d at 36. This is not the case here. It is clear from the SI's clean separation of schemes and schools that Heinel was not an integral part of the enterprise and that the enterprise's alleged illegal activity would have continued on without her.

It is likely for the reasoning above that the First Circuit declined to extend *Shifman* and

---

[8] Heinel is not even alleged to have been "peripherally involved" with the enterprise. There is absolutely no allegation in the SI that she had any knowledge whatsoever of the Key Enterprise's "related activities," including not only the cheating on college entrance exams scheme but also the other coaches' alleged involvement in facilitating the admission of athletic recruits to various universities. *See United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002); (SI, ¶¶ 36, 59-85).

instead applied the *Reves* "operation or management" test for participation in a RICO Conspiracy seven years later in *Cianci* and just four months ago in *Rodriguez-Torres*. *Cianci*, 378 F.3d at 94-96; *Rodriguez-Torres*, 939 F.3d at 28. Heinel cannot be criminally liable for RICO based upon her associate liability.[9] Count 1 must be dismissed for failure to state an offense.

## III.   THE GOVERNMENT IS WRONG THAT THE CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD COUNT IS A SINGLE CONSPIRACY WITH MULTIPLE OBJECTIVES (COUNT 2)

In an effort to rescue its fatally defective pleading, the government attempts to recast its duplicitous charge in Count 2 as a single conspiracy with multiple objectives.  (Gov. Opp. at 22-23.) But that is not what the SI actually charges. Rather, the SI charges entirely distinct groups of defendants, each with distinct goals and interests, operating during different time periods and within different institutions or companies – in other words, multiple conspiracies. *See United States v. Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (dismissing count for conspiracy to commit bank fraud against one bank as duplicitous where description of overt acts was "neatly divided between two distinct sets of coconspirators," the participants themselves did not overlap with the exception of two bank officers, the related corporate entities controlled by the two sets of coconspirators had "nothing to do with each other," and the loans related to one set of defendants were "totally unconnected with the transactions" involving the other set). The SI may not have to allege that *every* defendant is involved with every objective of the conspiracy, but it has failed to allege that *any* defendant was involved with more than one objective of the supposed singular conspiracy.  As a district court in this Circuit noted, a duplicitous indictment raises oft-recognized concerns that "a defendant may be convicted without unanimous juror agreement as to any of the offenses charged in the count in question and produce confusion as to the basis of the verdict which may subject a defendant to double jeopardy." *Id.* at 70. A duplicitous indictment also raises other issues, such as the potential to prejudice evidentiary rulings. *United States v. Hinton*, 127 F. Supp.

---

[9] Even if the test is whether Heinel was "plainly integral to carrying out the enterprise's activities," the SI is deficient. Heinel is only alleged to have been involved in one siloed aspect of the enterprise's activities.

2d 548, 553 (D.N.J. 2000).   Accordingly, the Court should decline to allow this defect to persist

through trial – particularly considering the early stage of proceedings – and order the government

to refine its indictment.[10] *See id.* at 554 (holding that if a court determines an indictment to be

duplicitous, the court "must either dismiss the duplicitous count in the indictment or require the

government" to choose one of the offenses within the duplicitous count).

The government offers no persuasive reason why this Court should ignore *Munoz-Franco*,

an in-Circuit case analyzing an indictment similar to this one. It notes only that a district court in

another Circuit has found *Munoz-Franco* inapplicable. However, even in the case on which the

government primarily relies, the government there alleged *some* basis for treating multiple

schemes as one conspiracy. (Gov. Opp. at 25 (citing *United States v. Ohle*, 678 F. Supp. 2d 215,

(S.D.N.Y. 2010) (indictment was not duplicitous where it described "mutual dependence and

assistance" between two schemes, which "occurred at the same time and had common

participants" and involved compensation paid amongst all the co-conspirators).   This, it has not,

and cannot do, here.

The government further misconstrues Heinel's argument by claiming that she challenges

Count 2 for lacking specific allegations that "an indictment is not required to plead." (Gov. Opp.

at 24.) Heinel has not challenged Count 2 because it lacks every detail that would be useful to the

defense, but because it utterly fails to connect two distinct groups of purported coconspirators by

any commonality. There is no overlap. As the government points out, "the key is to determine

whether the different sub-groups are acting under one overarching plan." (Gov. Opp. at 24 (quoting

*United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015).) But tellingly, the government's

opposition lacks any explanation for how these distinct sets of individuals were doing so. Instead,

the government claims that simply "alleg[ing] that the defendants 'conspired' in furtherance of an

overarching plan to gain admission to college…is sufficient to plead a single conspiracy." (Gov.

Opp. at 24.) In other words, the government argues that so long as it states there is one conspiracy,

---

[10] The defense understands that the Court's grant of a pretrial remedy will not end this
prosecution.  Heinel seeks only to be tried fairly and on the basis of her own alleged conduct.

no matter how vague or generalized its purported purpose, a count can never be duplicitous. But that is not the case, otherwise there would never be a duplicity problem.

Heinel should not be forced to proceed in defending against a count that could allow a jury to convict her of conspiring to commit a testing scheme in which the government concedes she was not involved. Nor should she be forced to defend against a count that, in the event of a conviction, would leave the record unclear as to which aspects of the purportedly singular conspiracy have been proven as to which university, testing company, or student. *See Hinton*, 127 F. Supp. 2d. 548, 554 (D.N.J. 2000); *United States v. Newell*, 658 F.3d 1, 27 (1st Cir. 2011) (emphasizing the danger that duplicitous indictments allow the prosecution to "bundle together" offenses that are strongly supported with ones that are not and that convictions based on such counts "may potentially lead to punishment over and above what the government's proof actually sustains."). The Court should dismiss Count 2 and allow the government to reassert it properly.

## IV.   THE GOVERNMENT IS INCORRECT THAT THE FEDERAL PROGRAM BRIBERY COUNT ADEQUATELY ALLEGES A QUID PRO QUO (COUNT 3)

Despite agreeing with the defense on the narrow definition of bribery punishable under 18 U.S.C. § 666(a)(1)(B), the government still nonetheless appears to believe that it is enough for its indictment merely to allege a payment and an act and leave it up to assumption and speculation that the two are related. But in order for there to be bribery, there must be a specific, agreed upon exchange – a quid pro quo – of the payment for the act. That agreed upon exchange is what the SI has failed to allege against Heinel in Count 3.

The government is correct that the timing of the payment is not material since a payment can be made after a transaction to fulfill a previously made agreement for a quid pro quo exchange. However, where there has *not* been that quid pro quo agreement and the payment is made after the fact, it is a gratuity and not a bribe, and not punishable under 18 U.S.C. § 666(a)(1)(B). *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993); *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013).  As Heinel detailed in her opening brief, the government's specific allegations

against her are infirm because, at most, they allege gratuities, and lack the quid pro quo exchange nature of bribes.[11]

In its Opposition, the government identifies only a single allegation against Heinel that purports to allege an agreed upon quid pro quo: "In exchange for the bribe payments, HEINEL helped facilitate the admission of more than two dozen students as recruited athletes[.]" (SI, ⁋ 63.) But other than using the word "bribe" to modify "payments," the SI provides no information about these purported payments or who the students were that would support the characterization of "bribe." For example, the SI alleges a "sham consulting agreement" (SI, ⁋ 60) which it presumably considers to be part of the "bribe payments," but no allegations link a single dollar of the consulting payments to any specific, bargained-for act.[12] The Opposition also fails to establish that payments to USC can constitute bribes to Heinel. *See Choy*, 309 F.3d at 605-06 (noting government's "inability to provide delivery . . . to the [] official"). Especially given the deficiencies in the government's other specific allegations against Heinel, it cannot save its inadequate pleading with a single reference to a "bribe."[13] *See United States* v. *Murphy*, 762 F.2d 1151 (1st Cir. 1985) (holding that indictment was invalid because it "did not identify *any* proceeding in which defendants were allegedly attempting to influence [] testimony" and "[c]rucial to preparation of any defense to a charge under the statute is at least some indication of the identity of the proceeding in which the defendant tried to influence testimony"). Because Heinel is deprived of notice of the charge against which she must defend, Count 3 should be dismissed for failure to state an offense.

---

[11] In its Opposition, the government states: "[a]nd there is simply no reasonable way to read the Superseding Indictment as Heinel proposes: that she sought to wield her influence to secure admissions spots for under-qualified recruits for free." (Gov. Opp. at 27.) But that is exactly Heinel's point: her actions on behalf of USC were not undertaken as part of some nefarious bribery and fraud scheme, but rather her expected duties in her role as the USC Senior Associate Athletics Director.

[12] For this reason, the government cannot save its deficient allegations by invoking a "stream of benefits" theory. "Stream of benefits" allows the government to aggregate the bribes but does not change its burden to prove the quid pro quo agreement for the ongoing stream of benefits. *See United States* v. *Lopez-Cotto*, 884 F.3d 1, 8 (1st Cir. 2018)

[13] This begs the question of how the grand jury was instructed on what a bribe was and what evidence was actually presented to it regarding the bribe payments.

## V.   THE GOVERNMENT IS WRONG THAT IT HAS PLED A MONEY OR PROPERTY RIGHT IN COUNTS 2, 11 THROUGH 16 AND 21

Relying exclusively on *United States v. Frost* to support its claim that the student-athlete recruitment scheme deprived the victim schools of property in the form of admissions slots, the government hopes that this Court will ignore critical differences between unissued diplomas and admissions slots. 125 F.3d 346, 367 (6th Cir. 1997). (Gov. Opp. at 41-42.) The government has not cited any authority (as there is none) establishing that admission to a university qualifies as "money or property" under the mail and wire fraud statutes. The rule of lenity thus directs the Court to dismiss Counts 2, 11 through 16, and 21 for failure to state an offense. *See Cleveland v. United States*, 531 U.S. 12, 25 (2000). Even if the Court were to find that the schemes pled in the SI involved property, the Court should nonetheless dismiss the mail and wire fraud counts because the SI does not sufficiently allege contemplated economic or other articulable harm.

### A.   Admissions slots are not equivalent to diplomas and do not constitute property under the mail and wire fraud statutes.

In the absence of directly relevant or controlling legal authority to support its argument, the government relies on *Frost*, 125 F.3d 346. (Gov. Opp. at 41.) However, as even the reasoning quoted by the government makes clear, there is a sharp distinction between admission to a university and earning a degree that matters in analyzing a university's property right or intangible right of control. Students are not automatically entitled to a diploma based solely on their enrollment – the university is entitled to weed out "inept students" or "students who have not earned [the degrees]," and thus a degree has a value that admission alone does not. *Frost*, 125 F.3d at 367. Admission is nuanced. It is affected by many variables whereas earning a degree is not. A student either passes or fails. The SI certainly does not allege that the schools were deprived of their ability to enforce stringent graduation requirements, enabling them to protect the value of their degrees regardless of which students were enrolled. This renders *Frost*'s reasoning inapposite.[14]

---

[14] In the context of a substantive due process challenge to a student's dismissal from a state university, the United States Supreme Court has indicated that students likely do not have a property interest in university enrollment, further underscoring the tenuous nature of the

The rule of lenity applies with particular force to ambiguities in the definition of intangible property – as distinct from traditional, hard property – under the mail fraud statute.[15] *See Cleveland*, 531 U.S. at 25 (*quoting Rewis v. United States*, 401 U.S. 808, 812 (1971) ("'[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity' … [especially] in construing § 1341 because . . . mail fraud is a [RICO] predicate offense."). The government cannot identify any squarely applicable persuasive authority, let alone binding authority, indicating that "admission to universities" unambiguously qualifies as money or property. (Gov. Opp. at 41-44.) Courts routinely decline to extend "the ambit of criminal statutes" to intangible property under these circumstances.[16] *Cleveland*, 531 U.S. at 25.

---

government's analogy to *Frost*. *See Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) ("As the Court correctly points out, [the student's] claim to a property right [in continued enrollment at a university] is dubious at best.")

[15] Several Supreme Court justices recently expressed skepticism towards the government's similar attempt to expand the definition of intangible "money or property" during oral argument in the appeal from the New Jersey "Bridgegate" mail fraud prosecution. *See Kelly v. United States*, No. 18-1059, Oral Arg. Tr. at 34, 34-42 (Jan. 14, 2020), available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-1059_6jfm.pdf. ("[Justice Breyer:] But 30 years in prison? That, I'm not sure. And that's -- this statute has to do with property fraud. And is taking the snowplow and putting it to the use of the public streets in violation of a rule, treating the mayor better -- is that a property crime?").

[16] *See, e.g., United States v. Henry*, 29 F.3d 112, 114-15 (3d Cir. 1994) (fair bidding opportunity for a government contract is not a property right, despite the fact that a winning bid would have resulted in money that would be property); *Roitman v. New York City Transit Auth.*, 704 F. Supp. 346, 349 (E.D.N.Y. 1989) ("reputation, good name, honor and integrity" are not property interests under mail and wire fraud statutes); *United States v. Ratcliff*, 381 F. Supp. 2d 537 (M.D. La. 2005) (salary and benefits paid by a county to duly elected candidate, who failed to properly report campaign contributions, did not constitute money or property because the county lost no money or property, only the intangible right to a fair election); *United States v. Novod*, 927 F.2d 726, 728 (2d Cir. 1991) (permit to operate a waste dumpsite is not a property right within the meaning of the mail and wire fraud statutes); *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) (neither government's potential forfeiture interest nor manufacturer's interest in destination of its products are property rights for purposes of mail fraud statute); *Westchester County Independence Party v. Astorino*, 137 F. Supp. 3d 586, 606 (S.D. N.Y. 2015) (intangible right to a free election is not a property right under fraud statutes); *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991) ("'Market share' is neither tangible or intangible property" under the mail fraud statute; *see also United States v. Berroa*, 856 F.3d 141, 148 (1st Cir. 2017), *cert. denied sub nom. Davila v. United States*, 138 S. Ct. 488 (2017) (holding that defendants did not violate mail fraud statute by submitting falsified test

**B.  The mail and wire fraud statutes do not apply here because the schools did not suffer economic harm or lose the benefit of their bargain.**

The SI does not assert that defendants "contemplated" any harm to the schools, much less that the schools actually suffered any "tangible" economic or other articulable harm, providing a separate basis for the dismissal of Counts 2, 11 through 16, and 21. *See United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997). As the Second Circuit recently held, "we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). Providing a financial donation to a university program as part of an accepted, and indeed, encouraged aspect of the admissions process is not a contemplated harm, but rather a contemplated benefit, to a school. Given that the schools "received the full economic benefit of [their] bargain," *Binday*, 804 F.3d at 570, the SI fails to plead the "articulable harm" required under the mail and wire fraud statutes, *see Rosen*, 130 F.3d at 9. Counts 2, 11 through 16 and 21 must therefore be dismissed for failure to state an offense.

## VI.   CONCLUSION

For the foregoing reasons, Counts 1, 2, 3, 11 through 16 and 21 must be dismissed for failure to state an offense and improper joinder. Fed. R. Crim. P. 12(b)(3)(B)(iv)-(v).

Dated:  February 14, 2020                                   Respectfully submitted,

  _/s/   Nina Marino_
NINA MARINO (CA Bar No. 142814)
KAPLAN MARINO, P.C.
9454 Wilshire Blvd., Ste. 902
Beverly Hills, CA 90212
Telephone:  (310) 557-0007
marino@kaplanmarino.com
(Admitted *pro hac vice*)
Counsel for Dr. Donna Heinel

---

scores in order to obtain medical licenses that were then knowingly used to provide health care services due to insufficient causal nexus between the fraud and the money or property)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on February 14, 2020.

 /s/ *Nina Marino*
NINA MARINO
Counsel for Dr. Donna Heinel