**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 19-CR-10081 |
| ) | |
| DONNA HEINEL ) | |
| ) | |
| Defendant. ) | |

**<u>DR. DONNA HEINEL SENTENCING MEMORANDUM</u>**

***LEAVE TO FILE UNDER SEAL GRANTED ON NOVEMBER 17, 2022 (DKT. NO. 1434)***

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    GUIDELINES CALCULATION ........................................................................... 2

III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
       SUPPORT A NON-CUSTODIAL SENTENCE ................................................... 3

       A.  The dark underbelly of admissions at USC ................................................... 3

       B.  Dr. Heinel establishes Clear the Clearinghouse .......................................... 10

       C.  Enter Rick Singer ....................................................................................... 13

       D.  Haden leaves USC and is replaced by Lynn Swann ..................................... 17

       E.  Singer offers to buy Clear the Clearinghouse and Dr. Heinel's consulting services ... 18

       F.  Singer's statements to the government regarding the $20,000 a month are
           contradictory and illogical ......................................................................... 23

       G.  Many of the more substantive changes Dr. Heinel made to athletic profiles were
           based on information she had received from Singer who she "trusted implicitly" ..... 27

       H.  This Court's Memorandum and Order is relevant to a fair and just analysis of the
           nature and circumstances of the offense ..................................................... 33

       I.  Conclusion ................................................................................................. 34

IV.    THE HISTORY AND CHARACTERISTICS OF DR. HEINEL FURTHER
       SUPPORT A NON-CUSTODIAL SENTENCE ................................................. 35

       A.  Dr. Heinel's dedication to her community and education ............................. 35

       B.  Dr. Heinel's role as an irreplaceable caretaker to her children is meritorious of a
           departure or variance to ensure a non-custodial sentence ............................ 39

       C.  Dr. Heinel's remorse and post offense rehabilitation .................................. 45

V.     A NON-CUSTODIAL SENTENCE FULFILLS THE GOALS OF SENTENCING .. 46

       A.  The seriousness of the offense, promoting respect for the law, providing just
           punishment all support a non-custodial sentence ......................................... 46

       B.  The severe collateral consequences Dr. Heinel and her family have already
           suffered provide sufficient deterrence ........................................................ 47

       C.  The kinds of sentences available, avoidance of disparity ............................ 48

## TABLE OF CONTENTS (cont.)

**VI.    CONCLUSION** ...............................................................................................48

**CERTIFICATE OF SERVICE** ...................................................................................49

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007).....................................................................................................39

*United States v. Abdelaziz*,
    Case No. 19-cr-10080 ..............................................................................................27

*United States v. Baker*,
    502 F.3d 465 (6th Cir. 2007) ...................................................................................39

*United States v. Gaskill*,
    991 F.2d 82 (3rd Cir. 1993) .....................................................................................40

*United States v Lehmann*,
    513 F.3d 805 (8th Cir. 2008) ...................................................................................39

*United States v. Martin*,
    520 F.3d 87 (1st Cir. 2008).......................................................................................39

*United States v. Munoz-Nava*,
    524 F.3d 1137 (10th Cir. 2008) ...............................................................................39

*United States v. Pearson*,
    282 F. Supp. 2d 941 (E.D. Wis. 2003).....................................................................40

*United States v. Rivera-Maldonado*,
    194 F.3d 224 (1st Cir. 1999).....................................................................................39

*United States v. Sclamo*,
    997 F.2d 970 (1st Cir. 1993).....................................................................................39

**United States Sentencing Guidelines**

U.S.S.G. §2B1.1 ...............................................................................................................2

U.S.S.G. §3B1.3 ...............................................................................................................2

U.S.S.G. § 3E1.1 ..............................................................................................................2

U.S.S.G. § 5H1.6 ............................................................................................................39

## **TABLE OF EXHIBITS**

Dr. Jeffrey Whiting Report ...................................................................................Exhibit A

Dr. Heinel *curriculum vitae* ................................................................................Exhibit B

Dr. Heinel Letter to Court....................................................................................Exhibit C

Singer Interview Report, September 27, 2018 (annotated)..................................Exhibit D

USC emails, compilation .....................................................................................Exhibit E

Character Letters..................................................................................................Exhibit F

Dr. Heinel personnel file excerpts ......................................................................Exhibit G

Clear the Clearinghouse Summary Exhibits .......................................................Exhibit H

Clear the Clearinghouse emails, assorted (annotated) .......................................Exhibit I

Communications between Janke, Singer and Khosroshahin, assorted ...............Exhibit J

Re. ████████ emails, assorted .........................................................................Exhibit K

September 21, 2015 email from Dr. Heinel to David Roberts ............................Exhibit L

July 18, 2015 email chain between Heinel and Haden .......................................Exhibit M

October 24, 2018 Singer/Heinel recorded call transcript ...................................Exhibit N

November 5, 2018 email with class plan and presentation .................................Exhibit O

March 30, 2016 email with presentation .............................................................Exhibit P

March 19, 2018 email between Singer, Heinel and Phil Wright .........................Exhibit Q

Singer and Heinel text messages re. CTC ...........................................................Exhibit R

February 7, 2018 email re. Athletically-Related Income disclosure requirements
and form ...............................................................................................................Exhibit S

2017 and 2018 Athletically-Related Income disclosures ...................................Exhibit T

June 19, 2018 email between Singer, business managers and Heinel .................Exhibit U

Dr. Heinel and ████████ text exchange............................................................Exhibit V

June 16, 2018 Heinel/Singer recorded call transcript – Call 1 ..........................Exhibit W

June 16, 2018 Heinel/Singer recorded call transcript – Call 2 ..........................Exhibit X

## TABLE OF EXHIBITS (cont.)

Dr. Heinel handwritten notes of calls and work with and for Singer ...............................Exhibit Y

Phil Wright voicemail ....................................................................................................... Exhibit Z

July 2, 2018 Singer/Wright recorded call transcript (annotated)....................................Exhibit AA

Singer Interview Report, September 21, 2018 (annotated)............................................. Exhibit BB

AUSA Notes of Singer Interviews (annotated) ............................................................. Exhibit CC

Singer Interview Report, December 13, 2018 ................................................................Exhibit DD

Singer Interview Report, November 26, 2019 ................................................................Exhibit EE

*United States v. Abdelaziz*, Case No. 19-cr-10080, September 17, 2021
trial transcript (excerpt)................................................................................................. Exhibit FF

Singer and Heinel text messages re. student information .............................................Exhibit GG

Singer, Heinel phone chart..............................................................................................Exhibit HH

Dr. Heinel Objections to PSR Letter, July 5, 2022 .........................................................Exhibit II

## I.      INTRODUCTION

Dr. Donna Heinel, formerly the highest-ranking woman in the athletic department at USC, appears before this Court for sentencing. Her conduct, for which she takes full responsibility, is not representative of who she was or is today. An outwardly strong and powerful woman with a fragile and insecure inner being, Dr. Heinel's fall from grace is the product of her own decision-making. But it is also the product of the pressures put upon her by a dysfunctional university school system at USC, and the powerful men who inhabited her orbit.

The athletic department at USC has long used walk-on spots to fundraise. While most, but certainly not all, members of SUBCO were unaware of this practice, the higher-ranking administrators of the athletic department and the larger university advancement office accepted and embraced this underbelly as business as usual. Despite how offensive Dr. Heinel found the use of walk-on spots as a fundraising mechanism, it was how she had been taught to do her job. So when Lynn Swann took over for Pat Haden as Athletic Director, and the pressure on her to fundraise increased, Dr. Heinel embellished athletic profiles of prospective walk-on students who presented donor interest. The athletic accolades were primarily provided to Dr. Heinel by Rick Singer and Dr. Heinel did not consider the falsity of those representations. Later, Dr. Heinel herself added embellishments to athletic profiles presented to SUBCO. She did this to secure the students' admission to USC, to secure donations to the athletic department and more specifically to the Women's Athletic Board ("WAB"), and she did this to maintain her position at USC which required fundraising for the WAB. In doing so, she violated her duty of honest services to the admissions department. She did this on her own. She did not conspire with Rick Singer to put through fake athletes, nor did she know that Laura Janke was creating fake athletic profiles.

1

As the Senior Associate Athletic Director ("SAAD") and Senior Women's Administrator ("SWA") in the athletic department at USC, Dr. Heinel was tasked with both presenting prospective walk-on athletes to SUBCO (as the SAAD) and with raising funds (as the SWA). In every other aspect of the university system, development (a.k.a. "fundraising") is an entirely separate department from admissions. The reason for the separation is obvious – money and admissions should never be mixed at a university, yet for Dr. Heinel, they were by the athletic department's design. Her conduct is the unfortunate result of a woman trapped in an unworkable job description facing tremendous pressure to fundraise and targeted by Rick Singer's infamous brand of manipulation and deception.

It is respectfully requested that this Court take these factors and others to be more fully described below into account when determining a sentence that is sufficient but not greater than necessary to fulfill the goals of sentencing, and that, in doing so, this Court sentence Dr. Heinel to a non-custodial sentence.

## II.    GUILDELINES CALCULATION

Probation determined a total offense level of **7** (0-6 months) calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(1)) | +7 |
| Specific Offense Characteristics | +0 |
| Abuse of Position of Trust (U.S.S.G. §3B1.3) | +2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -3 |
| **Total Offense Level** | **7** |

(PSR ¶¶224-233.)

Dr. Heinel agrees with Probation's Guidelines calculation and offers the below position in support of a non-custodial sentence at the low end of the Guidelines with a significant community service component.

## III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A NON-CUSTODIAL SENTENCE

### A.   The dark underbelly of admissions at USC

Donna Heinel started working in the USC athletic department as a volunteer intern in 2003 and, over the course of the next 16 years, other than her wife and children, USC became the most important thing in her life. "Fight On!," the USC athletic department motto, became her motto, and with each passing year, USC became more and more of her family. By 2006, Dr. Heinel had been promoted to the position of Director of Admissions and Eligibility serving under Brandon Martin, the Senior Associate Athletic Director ("SAAD"). (Ex. A, Dr. Whiting Report, at 4; Ex. B, Dr. Heinel C.V.; Ex. C, Dr. Heinel Letter.) Under Brandon Martin, Dr. Heinel learned that at USC, walk-on spots were sometimes used to achieve donations. (Ex. A, Dr. Whiting Report, at 4-5.) Brandon Martin's success at this practice started a running joke in the athletic department that he should have a street in Orange County (California) named after him for all the kids he secured admissions for as walk-on student athletes.[1][2]

When serving under Martin, and later when she replaced Martin as SAAD, Dr. Heinel was not tasked with verifying a prospective student's athletic accolades or a particular coach's interest in a particular walk on athlete. She therefore never viewed Martin's role, or her role, as

---

[1] Orange County is recognized as a very affluent area and is the county next to Los Angeles.

[2] See also Ex. D, Sept. 27, 2018 Singer Interview Report (annotated) (in which Singer tells the FBI that "Martin received payments from families and did his own side doors").

that of a "gatekeeper" tasked with verifying what was told to her in terms of athletic accolades or coaches' interest. (See Ex. A, Dr. Whiting Report, at 7-8, 12.) Her responsibility to SUBCO as the SAAD was limited as follows: (1) in connection with the preparation of the athletic profile, Dr. Heinel was charged with ensuring consistency in formatting, consistency in accolade/tournament descriptions and placement,  providing appropriate detail as required by SUBCO and ensuring that the athletic profiles for SUBCO consideration were delivered to the committee members 48 hours in advance of the meeting; (2) at the time of the SUBCO meeting, Dr. Heinel was charged with responding to subcommittee member questions regarding the candidates as best she could and/or obtaining additional information on the candidates as requested by the SUBCO; and (3) rejecting from consideration applicants with no demonstrable athletic ability. (See e.g., Ex. E, USC emails compilation, at 33, 58, 135-38[3] (showing instances where Dr. Heinel assisted with the preparation of athletic profiles and voiced her opposition to presenting a non-athlete to SUBCO in exchange for a donation).)

In 2010, around the same time the NCAA investigation into the athletic department yielded crushing sanctions for the university[4] (one of the many scandals that have plagued USC for decades[5]), Max Nikias became the president at USC and embarked on a "$6 billion

---

[3] Page numbers for Exhibits are located at the bottom left of the page and do not correspond to the bates numbers at the bottom right.

[4] See ESPN, Kevin Gemmell, "A timeline of USC turmoil, scandals and coaching upheaval," Oct. 13, 2015 (https://www.espn.com/blog/ncfnation/post/_/id/117845/a-timeline-of-usc-turmoil-scandals-and-coaching-upheaval) (chronicling the NCAA investigations, sanctions and continued scandal in the athletic department).

[5] See Los Angeles Times, Michael Finnegan and Matt Hamilton, "Former USC dean admits to arranging bribery payment for Mark Ridley-Thomas," Sept. 15, 2022 (https://www.latimes.com/california/story/2022-09-15/former-usc-dean-flynn-to-plead-guilty-mark-ridley-thomas-bribery) (detailing USC former dean's agreement to plead guilty to bribery of councilman Ridley-Thomas, who is also charged and is fighting the charges, for a favorable

fundraising campaign, the largest in the history of higher education."[6] To help achieve his goal,

Nikias appointed Patrick ("Pat") Haden, former star USC and Rams football player, a Rhodes

Scholar, a lawyer, USC Board of Trustee member, and a private equity practitioner with a track

record of success in raising funds, as USC's Athletic Director.[7]

It was also during this time that Brandon Martin left USC, leaving open his position as

Senior Associate Athletic Director ("SAAD"). Dr. Heinel applied for and obtained the

---

contract with Los Angeles); Los Angeles Times, Matt Hamilton, "Karen Bass got a USC degree
for free. It's now pulling her into a federal corruption case," Sept. 7, 2022
(https://www.latimes.com/california/story/2022-09-07/karen-bass-usc-degree-federal-corruption-
case) (detailing the Los Angeles mayoral candidate who also received a scholarship deemed
"critical" to the Ridley-Thomas prosecution);  Los Angeles Magazine, Jason McGahan, "How
USC Became the Most Scandal-Plagued Campus in America, i.e., School for Scandal," April 24,
2019 (https://www.lamag.com/citythinkblog/usc-scandals-cover/) (listing several of the major
scandals, including, but not limited to: Sept. 2014: hedge fund manager gets his daughters into
USC's film school with a $5 million, tax-deductible "gift"; May 2015: "In protest of funding
cutbacks, forced faculty departures, and structural changes, all of the school's 2016 MFA
students drop out of the formerly prestigious Roski School of Art and Design[;]" Oct. 2015: USC
"football coach Steve Sarkisian is fired after he appears intoxicated at several team events,
including a pep rally where he is seen slurring his speech and swearing[;]" March 2016: "Med
school dean Carmen A Puliafito resigns from is $1.1 million post after its revealed that he had
meth-and ecstasy-fueled parties with young associates, one of whom overdosed in his
presence[;]" June 2017: "An anonymous donor drops $15 million for a residential hall…[;]" Oct.
2017: "Vice president David Carrerar, who led a $6 billion fundraising campaign for the
university, leaves his post following claims that he sexually harassed female colleagues[;]" Oct.
2017: "New med school dean Rohit Varma (who replaced Puliafito) is ousted after it surfaces
that he sexually harassed a medical fellow in 2003[;]" May 2018: "In light of nearly 30 years of
sexual misconduct allegations by dozens of women, USC gynecologist George Tyndall is
allowed to quietly resign (with a payout) after striking a secret deal with administrators. Some
suspect he will cost USC upwards of billion dollars in settlements."). See also "Bad City: Peril
and Power in the City of Angels," Paul Pringle, July 19, 2022 (https://bookshop.org/books/bad-
city-peril-and-power-in-the-city-of-angels/9781250824080) (nonfiction expose novel on two of
the USC doctors involved in malfeasance at USC and author Pringle's investigation into the
shocking events).

[6] Philanthropy News Digest, "USC Announces $6 Billion Fundraising Campaign," Aug. 30,
2011 (https://philanthropynewsdigest.org/news/usc-announces-6-billion-fundraising-campaign).

[7] USC News, "Pat Haden Named New Athletic Director," July 21, 2010
(https://news.usc.edu/27320/pat-haden-named-new-athletic-director/).

"prestigious position" of SAAD and Senior Women's Administrator ("SWA") under Haden's leadership. (Ex. A, Dr. Whiting Report, at 6-7.) Dr. Heinel "was honored to be promoted to [SAAD] under Pat Haden" and the excitement for her new position bubbled over beyond work to her friends and family where her discussions of "her important work on upholding Title IX for [the] University and helping underprivileged people achieve their dream of attending USC" permeated dinner table conversations and personal interactions for years to come. (Ex. F, Character Letters, at Barbara Heinel, *passim*.) She also "felt deeply indebted to Pat Haden for trusting her with this responsibility [and] was determined to demonstrate to him that his faith in her was well placed." (Ex. A, Dr. Whiting Report, at 7.) "Under Haden's leadership and guidance, the [athletic department] quickly began to thrive, and the donations generated through its efforts exploded." (Ex. A, Dr. Whiting Report, at 7.)

Recognizing Dr. Heinel's natural talent and work ethic, Haden took her under his wing. When Haden's son came out as homosexual, Dr. Heinel, a vocal supporter of LGBTQ rights, helped and educated both Haden and his son. When Dr. Heinel suffered serious injuries after falling off a ladder, Haden arranged for a team of specialists to immediately provide top notch medical care to Dr. Heinel. (Ex. A, Dr. Whiting Report, at 8.) Haden became her mentor, friend, and confidante whom Dr. Heinel revered and respected deeply. (See id.) As Dr. Whiting notes, "[u]nlike her father [who was an unmotivated worker, an unloving father and a homophobe], [Haden,] this esteemed older male, respected her, cared about what she thought, trusted her, and was not shy in verbally and behaviorally demonstrating his affirmation and affection for her." (Id. at 2-3, 12.)

As the SAAD and the SWA, Dr. Heinel had a lot of responsibility. Presenting athletic candidates to SUBCO – both walk on and scholarship candidates – and fundraising, were just

two of the many jobs she was required to perform. (See PSR ¶¶ 44, 47, 271; Ex. G, Dr. Heinel

personnel file excerpts.) Yet these two jobs created an undeniable conflict. Although she disliked

and struggled with fundraising, she was herself primarily responsible for securing donations for

the Women's Athletic Board ("WAB") that provided essential funding to women's sports which

are underfunded and under-supported by donations, being cast in the shadow of USC's

prestigious money-making men's teams – football and basketball. (See PSR ¶¶ 46, 47.) Despite

having these fundraising obligations, the position of SAAD also required that she present

prospective athletes, both scholarship and walk-ons, to SUBCO.

The members of SUBCO were, for the most part, generally insulated from the process of

using walk on slots to raise funds. However, senior level administrators and development

officers in the athletic department, as well as the larger university advancement office accepted,

encouraged, and pursued the use of the walk-on process to gain donations. If the student played

the sport, or even *a sport*, and the family had donor potential, or in many cases had agreed to

make a donation once the student was admitted, the athletic department would often present the

student to SUBCO as a walk-on.[8] Also, the VIP admission process and the SUBCO walk on

---

[8] See e.g., Ex. E, USC email compilation, at 1 ("Potential donor for us and friend should I push
it? She doesn't have to be on team but can we help with admissions knowing she could be cut"),
2 ("This is the walk on for ▮▮▮▮▮ that Dad has $ ... not sure ▮▮▮▮▮ will take her ....
but I am interested in the Dad $$"), 5 ("The family is considering the size of the gift to
Athletics…He was essentially promised a walk-on position so he could train for the team"), 7
(walk on slot for donation), 48 ("I am writing to confirm our meeting tomorrow with ▮▮▮
▮▮▮▮▮ at 11:00am. To remind, ▮▮▮▮▮ is a USC grad and an extremely wealthy and
powerful person ▮▮▮▮. He has a ▮▮▮▮ and a ▮▮ in high school. He has
already given us ▮▮ and has promised an additional ▮▮▮"), 79 (Pat Haden; "Very important.
$10 mil opportunity. Plus the kid can help us I need to get back to him ASAP"), 81 (Dr. Heinel:
"All, We are looking at middle of next week for admissions decisions." Pat Haden: "Ron, pls call
▮▮▮▮▮ and have him rejoin his support group. I already spoke to him and he is expecting
your call. Got his son in" Ron Orr: "I have a million riding on mine hopefully your ▮▮ can
step up"), 82 ("Any time on Monday to meet with her? Can get a six figure gift out of the family.
I can get her info prior"), 84 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

process were often utilized simultaneously to secure the admission of a donor and the crossover

between these two mechanisms to secure the admission of a student from a donor family was

known and accepted among top level administrators, including Dean Tim Brunold and others on

SUBCO, Pat Haden, and the athletic development office. (See e.g., Ex. E, USC email

compilation, at 35-36, 61, 66, 103-04, 105-06, 112, 116, 117, 119-120.)

Because Brunold maintained the univeristy-wide VIP list, he, above all others on

SUBCO, was particularly attuned to which families had been earmarked for donations. If for no

other reason, because of the crossover between SUBCO and VIP prospective students, Brunold

knew which SUBCO recruits were being targeted for donations, and Dr. Heinel knew that he

knew. Dr. Heinel's knowledge that the Dean of Admissions knew VIP students tagged for

donations were being admitted through the walk-on process served to normalize the admissions

underbelly of USC only further. (See e.g., Ex. E, USC email compilation, at 36 (screenshot

below), 66, 103-04, 112, 116, 117, 119-120.) This underbelly at USC, while distasteful to Dr.

Heinel, was a clearly accepted practice entrenched long before Dr. Heinel assumed the position

of SAAD.

//

//

---

), 88 ("I spoke to them about a "gift
a gratitude" if we got her in and [parent] asked how much this would be. I told him 6 figures."),
94 ("I am taking her to subco as ▮▮▮▮▮▮ on but she is not good enough to make the team."),
122 ("she is a mediocre practice player who would never get playing time in the top competing
spots. I believe she said her dad was a donor or potential donor so I wanted to pass her on to you
to see if you would like to add her to the roster as a practice player").)



Evidence confirms that securing the admission of mediocre athletes through SUBCO as walk-on athletes in exchange for donations to the athletic department and/or the university was a recognized practice at USC. As SAAD, prospective walk-on athletes with donor potential were referred to Dr. Heinel for presentation to SUBCO as walk on athletes by university advancement, the athletic development office (Ron Orr, Alexandra Bitterlin, Scott Jacobson, etc.), legacies (██████████, etc.), and friends of USC (████████, ████████████, ████████████, etc.).[9] (See e.g., Ex. E, USC email compilation, at 8 (advancement to athletics: "Can either of you check in with me for an update on how the new coaching staff received the news about the arrangement

_____

[9] The offense conduct notes that between 2013 to 2017 several prospective student-athletes and VIP students were brought to Dr. Heinel by former USC coaches Laura Janke and Ali Khosroshahin. (PSR ¶¶ 53-102.) There is no evidence that Dr. Heinel knew any of the information provided to her by Janke or Khosroshahim was fabricated or that she herself did anything to fabricate information that was presented to admissions on behalf of these students. Nor is there any evidence that Dr. Heinel knew these individuals were working with Rick Singer in connection with these students or in any capacity.

that ███████████ had with ████████ about practicing with the team when ███ arrived on campus. I'm due to talk with ████████████ tomorrow to further our discussion about a gift to athletics and I just wanted to make sure that I had an update"); 13 ("What is the name of the ███████████████ that development wants us to present?"), 46 (███████████ email to Dr. Heinel checking on the admission of a prospective student athlete he referred to Athletics), 69 (list of SUBCO admits with specific donor potential), 139-143 (in discussing getting a prospective student admitted because of family's donor potential, ████████████ states "I think you guys should make a big ask when you see him in a few weeks and see what he's willing to do").)

Haden heaped praise on Dr. Heinel for her ability to secure the admissions of particularly challenging cases, "you never cease to amaze me, he would say." (Ex. A, Dr. Whiting Report, at 9.) Dr. Heinel deeply appreciated Haden's appreciation of her performance in this and all realms. (See Ex. A, Dr. Whiting Report, at 9.) The only "rule," as both Martin and later Haden explained to Dr. Heinel, was that when cultivating a family for admission based on expected donations, the "ask" could not be made until after the student was admitted so as not to create the appearance of a quid pro quo. In practice, this "rule" was more of a formality and discussions about money and donations were regularly had prior to admission. (See n. 8, *supra*; Ex. E, USC email compilation, *passim*.)

### B. Dr. Heinel establishes Clear the Clearinghouse

Likely due to her own neglected upbringing, Dr. Heinel's true passions have always centered around improving the underprivileged' access to higher education and women's rights in the athletics system. (Ex. C, Dr. Heinel Letter; Ex. F, Character Letters, *passim*.) In addition to her role as SAAD and SWA, Dr. Heinel taught courses on the student-athlete experience and gender issues in the athletic administration as an adjunct professor at USC Rossier School of

Education in the masters and doctoral programs. (PSR ¶¶ 269, 271; Ex. B, Dr. Heinel C.V.; Ex. C, Dr. Heinel Letter.) She designed the curriculum herself and she created workshops for economically underprivileged athletes to help them cope with the extreme affluence prevalent in all aspects of campus life at USC. (PSR ¶ 269, Ex. B, Dr. Heinel C.V.; Ex. C, Dr. Heinel Letter; Ex. F, Character Letter, *passim*.) And she did her doctoral dissertation on "A Comparative Case Study of Academically At-Risk African American Division One Male Football Student-Athletes." (Ex. B, Dr. Heinel C.V., Ex. C, Dr. Heinel Letter; Ex. F, Character Letters, Rachel Heenan.)  As Dr. Heinel's wife notes, "Donna was constantly looking for ways to bring higher education opportunities to 'all' students[]." (Ex. F, Character Letter, Rachel Heenan.)

In furtherance of her passion for education and athletics and recognizing a deficiency in the information available regarding NCAA eligibility requirements for incoming collegiate students, in 2005, Dr. Heinel started a company called Clear the Clearinghouse ("CTC"). (PSR ¶ 270; Ex. B, Dr. Heinel C.V.; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.) Through CTC, Dr. Heinel gave presentations to large audiences at USC and elsewhere and traveled to over 100 local high schools to educate counselors, students and parents about NCAA eligibility requirements, including prerequisites that needed to be completed in high school in order to be eligible to play Division 1 and 2 sports in college. (PSR ¶ 270.)

//

//

//

//

//





(Ex. H, CTC summary exhibits.[10])

---

[10] Supporting materials as referenced in the Exhibit E will be made available upon request.

Dr. Heinel became a recognized expert in NCAA requirements, rules and regulations, and was highly sought-after for her knowledge and expertise. (See Ex. H, CTC summary exhibits; Ex. I, CTC emails (annotated), at 1 ("You were awesome – so informative and interesting and articulate."), 4 ("I strongly feel that you are also the best expert I've heard presenting in this area."), 7 ("I really enjoyed you and Donna's presentation. Would you guys be willing to present at a Counseling Network for Riverside County. There will be 400 counselors present…"), 9-10 ("It was extremely informative, and I was very glad that I made the trip up from San Diego to attend….The workshop was fabulous").) She even brought on former USC Assistant Athletic Director, ███████, to assist her with the presentations and handle some himself as the business grew. (Ids.) After 10 years, CTC was on the map and Dr. Heinel started thinking about what she could do to build it out and perhaps sell it.

### C.  Enter Rick Singer

In the summer of 2015, Pat Haden introduced Dr. Heinel to William "Rick" Singer as a well-connected person who could bring development prospects to USC and particularly the athletic department. (Ex. A, Dr. Whiting Report, at 8; Ex. C, Dr. Heinel Letter.)

Dr. Heinel was skeptical at first, and even expressed her reservations to Haden. (See PSR ¶ 71.) But, per the instruction of Haden, she did some research, asked around (PSR ¶ 71), and Singer ultimately seemed to check out. (See PSR ¶ 73; Ex. A, Dr. Whiting Report, at 8; Ex. J, Communications between Janke, Singer and Khosroshahin, at 18-24.) On July 7, 2015, Heinel texted Janke and asked her about Singer, "Did he deliver Doug Hodge[11] to you[?]…He is trying to get close to Pat and dropping names of people that he has 'delivered['] to USC athletics to win

---

[11] Doug Hodge was known to USC as having big donor potential and had already donated when his son was admitted. (See PSR ¶ 69.)

Pat over. I was very skeptical and wanted to know the real story." Janke responded, "I think he knows the family well. Doug spoke highly of him when he told me that they used him for the application process." Heinel replied, "Ok. Thanks. I just always want to protect the process, keep the highest integrity, and protect the trust of admissions that I have spent 13 years cultivating." (PSR ¶ 73.) She also learned Rick Singer brought former USC ███████████████████ ██████████████████████████, an incredibly talented and successful athlete.[12]

Dr. Heinel's research included asking Tim Brunold what he knew about Rick Singer. Brunold, thinking that Singer owned a basketball academy highly disfavored in higher education, advised Dr. Heinel to "steer clear." (PSR ¶ 72.) But after further research and several months later, she emailed Dave Roberts, USC Compliance Officer, "Dave, Found out a little more about this...Rick Singer's company The Key donates services to inner city high schools and charter school[s] in all sport (MBSK [men's basketball] included) to help educate low income families about the admissions process...[] In his talks with Pat he probably mentioned MBSK..." (Ex. L, September 21, 2015 email from Dr. Heinel to David Roberts.)[13] Dr. Heinel concluded that Brunold's advice to "steer clear" was due to a mistaken belief regarding Singer's ownership of a disfavored basketball academy.

---

[12] See Ex. K, Re. ███████ emails ████████████████████████████████████ ████████████████

[13] The offense conduct makes note of a September 16, 2015 email between Heinel, Ron Orr and Steve Lopes, both in the athletics development office, about Singer promising to deliver admission through the walk on system and how Heinel has been trying to curtail his influence. (See PSR ¶ 74.) The reference to "need to curtail influence" refers to Singer referring prospective athletes with donor potential to coaches who would then apply donations to their individual sports. Pat Haden had instructed Dr. Heinel that donations of such nature shouldn't be siloed in individual sport gift accounts. Of course, in later years, that is exactly what Dr. Heinel did, she siloed donations from Singer students into the Women's Athletic Board ("WAB"), a sad product of the inherent conflict in her job duties as SAAD and SWA.

Throughout this investigative process, Singer continued to send Haden potential student applicants with donor prospects which Haden forwarded to Dr. Heinel. (See e.g., Ex. M, July 18, 2015 email chain between Heinel and Haden (in which Haden and Heinel agree to further discuss Singer and a potential student whose family, according to Singer "has already provided USC 100k").) Therefore, proceeding cautiously at first and with Haden's blessing, Dr. Heinel began to accept Singer's students as prospective walk on athletes for submission to SUBCO. (See PSR ¶ 75, n. 6.)

Dr. Heinel liked Rick Singer. For his first meeting in her office, he arrived with wet hair straight from the USC pool, saying he had just come from swimming and a meeting with Coach Vavic. He said he had good relations with all the coaches at USC and had their cell phone numbers in his phone. He represented himself as an athlete and looked very much the part in his standard garb of athletic attire. Dr. Heinel, an athlete herself, believed he was one of her own kind, a person who loved sports, loved helping the youth, and loved USC. And "Dr. Heinel liked the fact that Singer was energetic, worked hard, and seemed to be on top of his profession of being a college counselor for prospective student athletes.  He knew many of the USC coaches and distinguished alums of the school." (Ex. A, Dr. Whiting Report, at 8.) As promised, Singer brought Dr. Heinel qualified student-athletes who had donor potential, or so Dr. Heinel believed. And Singer's connections to wealthy families who were eager to make donations eased Dr. Heinel's fundraising obligations – an essential aspect of Dr. Heinel's job that she struggled most with. (See Ex. G, Dr. Heinel personnel file excerpts.)

Dr. Heinel did not know Singer was sending her fraudulent athletic profiles, or that the students weren't real athletes, and there is no indication to the contrary. (See PSR ¶¶ 76-216, *passim*; *c.f.,* PSR ¶¶ 103-05; Ex. A, Dr. Whiting Report, at 10.) Dr. Heinel frequently queried

Singer regarding the students' activity in the sport, confirmed athletic ability, and advised Singer what the students needed to do to ensure they remained eligible walk-ons for the teams at USC. (See e.g., PSR ¶ 174 ("I just want to make sure those students are still involved with the sport. Um, that they w-have registered with the NCAA Clearinghouse and Eligibility Center. Um, and that if questioned at the school that they respond in an appropriate way that they are, um, walk-on candidates for their respective sports…" ), ¶ 206 (Heinel: I just wanted to make sure that, uh, you, know, she's a legit water polo player. Singer: Yeah, she's (inaudible) team, the whole thing. Heinel: That we're not making – Singer: Yeah").) In response to Dr. Heinel's inquiries, Singer never even suggested that the student candidates were not actual athletes, or that the accolades were not real, conversations Singer regularly had with Janke and Khosroshahin. (See e.g., PSR ¶¶ 103-105 (Janke creates a profile for ████████████ with a picture of her on an ergometer which Singer sends to Dr. Heinel, Dr. Heinel asks Singer for a picture of her actually in the boat, Singer emails Janke, "Donna asked for a picture of her in a boat. Is there a coxswain picture we can use that is tough to see the face…?"), ¶ 129-131 (Janke tells Singer, "[i]f they don't have items pertaining to the sport let me know and I will create"); Ex. J, communications between Janke, Singer and Khosroshahin, at 1 (Singer to Janke: "Maybe we stage [photo for SUBCO profile] at school?"…Janke to Singer: "Perfect. If he can be ████ in it as well to make it look like he is ██████████ Singer: "Will do"), *passim*.) Dr. Heinel therefore believed the students Singer brought her were real athletes with real accolades, maybe not the best and maybe not Division 1 quality,[14] but nonetheless athletes who played the sport and who the coaches at USC wanted on their teams. (See PSR ¶¶ 174, 206; Ex. A, Dr. Whiting Report, at 12.)

---

[14] The practice of presenting students with donor potential who played the sport but weren't Division 1 material was a regularly accepted use of SUBCO in the athletics department. (See sec. III, A, *supra*.)

Dr. Heinel came to trust Singer implicitly (see Ex. N, October 24, 2018 Singer/Heinel recorded call transcript, at 4 (Heinel: "Yeah, I know. I trust you implicitly, OK?")) and looked up to him, even revered him, as a smart and successful businessman and entrepreneur who had built an empire in a niche industry, much in the same way Dr. Heinel hoped to do for herself someday. (See Ex. A, Dr. Whiting Report, at 10.)

### D.  Haden leaves USC and is replaced by Lynn Swann

In April 2016, due to health concerns, Pat Haden stepped down as the Athletic Director of USC. Dr. Heinel had grown very fond of Haden and his departure from USC was difficult for her. (Ex. A, Dr. Whiting Report, at 9.) They had cultivated a friendship and a strong working relationship. (Id. at 8-9.) He respected and trusted her and she him. (Id.) In his stead, Lynn Swann was selected to replace him. Dr. Heinel did not have a similar repour with Swann as she did with Haden. (Id. at 9.)

"To her, Swann was a figurehead appointment and exhibited no interest in the success of the athletic department or her efforts. In addition, she felt he simply did not like her, whether it was because she was a woman or because she was gay, she never knew. This disinterest and perceived dislike translated in Dr. Heinel's mind into a profound lack of job security." (Id. at 9; see also Ex. D, Sept. 27, 2018 Singer Interview Report (annotated) ("Last year, HEINEL was worried that she would lose her job because a new athletic director was hired.").)

In early 2018, Swann gave Dr. Heinel a small promotion. (See Ex. G, Dr. Heinel personnel file excerpts, at 9-10.) But with that promotion, her development obligations became baked into her job descriptions and the pressure increased. (See id.) Now not only did she have a poor working relationship with her superior, but he stressed as part of her employment the very area Dr. Heinel struggled the most with – development. (Id.) She began embellishing athletic

profiles when the walk-on candidate had development potential. (PSR ¶ 140; Ex. A, Dr. Whiting Report, at 12.) She did this to ensure SUBCO would accept the candidate so that the WAB would receive a donation which was necessary to the fulfillment of her job duties and now more imperative than ever under Swann. (Ex. A, Dr. Whiting Report, at 12; Ex. G, Dr. Heinel personnel file excerpts, at 9-10.) Not a day goes by that Dr. Heinel isn't "ashamed, embarrassed, and humiliated with her involvement in this" conduct. (Ex. A, Dr. Whiting Report, at 11; PSR ¶ 262.) "It is the first thing [she] think[s] about in the morning and the last thing [she] think[s] about when [she] tr[ies] to go to sleep." (Ex. C, Dr. Heinel Letter.) "'I have no good explanation. There can be none.  I deeply regret what I did.'" (Ex. A, Dr. Whiting Report, at 12.)

### E.  Singer offers to buy Clear the Clearinghouse and Dr. Heinel's consulting services

In large part due to her job insecurity under Swann, starting in around 2016, Dr. Heinel began taking classes towards a master's in business administration with a specific focus on entrepreneurship and innovation to learn how to grow and ultimately sell CTC. (See Ex. A, Dr. Whiting Report, at 9-10; Ex. B, Dr. Heinel C.V., Ex. O, Nov. 5, 2018 email with class plan and presentation; Ex. P, March 30, 2016 email with presentation.) Because she viewed Singer as a successful entrepreneur and mentor, Dr. Heinel discussed CTC with Singer and he expressed interest in the business. (Ex. A, Dr. Whiting Report, at 10.) Dr. Heinel' s respect and admiration for Singer as a successful businessman is evidenced in the fact that she listed him (along with Katherine Harrington, Vice President of Admissions at USC) on her advisory board for her final business plan presentation in her entrepreneurship class in Spring 2016. (Ex. P, March 30, 2016 email with presentation.) To Dr. Heinel (and many others), Singer was a legitimate and very successful businessman who had turned his love of sports and education into money making entities that benefitted student athletes, and Dr. Heinel deeply respected and admired him for it.

Therefore, when Singer started discussing with Dr. Heinel his various business ventures including a new company called Counting Stars Singer was creating with Phillip ("Phil") Wright, Dr. Heinel was interested.[15] Singer's Counting Stars project was intended to be a sort of camp for high school kids where they would be evaluated by college-level coaches, given honest feedback on their skills, and receive advice and guidance about the college admissions process through athletics, and more.[16] CTC had elements of it that would benefit Counting Stars, and Dr. Heinel and Singer discussed how the two companies could benefit from one another. Singer proposed that they could merge the relationships they had at various high schools, he through his college consulting business and she through CTC. In this new venture, Dr. Heinel would be the face of the company, she would visit high schools to meet with counselors, parents and students to garner interest in and clients for Counting Stars.[17] Dr. Heinel would also be responsible for

---

[15] Los Angeles Times, "Rick Singer had grand plans beyond college admissions. Then scandal brought him down," Joel Rubin and Matthew Ormseth, April 29, 2019, (https://www.latimes.com/local/california/la-me-college-admissions-scandal-rick-singer-business-20190429-story.html).

[16] See n. 15, *supra*.

[17] The offense conduct notes the invoices Dr. Heinel provided to Singer which listed the high schools, and one time, the students, that Singer and Dr. Heinel collaborated on for admission at USC. (PSR ¶ ¶ 207, 210, 213, 216.) This was not in furtherance of the scheme, but was a poorly described way of indicating the future work Dr. Heinel intended to do with Singer. The admission dates for the student names/high schools on the invoices don't even correlate with the timing of the $20,000 a month but are merely a listing of the high schools of the students in alphabetical order from the beginning of the Singer and Dr. Heinel's relationship that Dr. Heinel worked with Singer on. (See e.g., PSR ¶ 207: Abdelaziz was admitted in October 2017, nine months before the $20,000 payments started, Blake was admitted in September 2017, ten months before the $20,000 payments started, and Bizzack was admitted in October 2017, nine months before the $20,000 payments started.) These students' names/high schools on the invoices also are almost entirely unique from the students Singer told the government he was personally paying Dr. Heinel for. (*See* sec. F, *infra*.)

educating students at the Counting Stars camps on NCAA requirements, just as she had been doing with CTC.

By the Spring of 2018, Dr. Heinel was asked by Singer to consult with him on his ventures and to consult with him and his partner Phil Wright on the Counting Stars venture. They began to discuss next steps. (See Ex. Q, March 19, 2018 email between Singer, Heinel and Phil Wright about "next steps and any questions"; Ex. R, Singer and Heinel text messages re. CTC, at 1-8, 11-12 (in which Singer tells Dr. Heinel he would "love to have [her] be a part of what [they were] doing" and Dr. Heinel provides consulting advice).)

By June 2018, Dr. Heinel agreed to sell CTC to Rick Singer and to provide ongoing NCAA consulting services in connection with Counting Stars and his other business ventures for $400,000 payable in monthly payments of $20,000.[18] (See Ex. A, Dr. Whiting Report, at 9-10; Ex. R, Singer and Heinel text messages re. CTC, at 9, 13-17 (discussing payments for Dr. Heinel's "compliance services" and consulting work); Ex. U, June 19, 2018 email between Singer, business managers and Heinel regarding Dr. Heinel becoming a consultant; Ex. V, Dr. Heinel and ███████ text exchange (in which Dr. Heinel tells ██████ she sold her business).) "Dr. Heinel was happy because in a few short years, her plan for CTC had yielded real monetary value, something she had dreamed of and worked so hard to achieve." (Ex. A, Dr. Whiting Report, at 10.) From Dr. Heinel's perspective, her efforts to educate herself and obtain a master's

---

[18] The offense conduct states that Dr. Heinel "falsely categorized the [the payments she received from Singer for CTC] as 'speaking engagements.'" (PSR ¶ 21.) But the money she earned from CTC doesn't fall into *any* of the categories provided on the form, in fact, it isn't even clear that Dr. Heinel was required to disclose the money she earned for the sale of her business and her consulting services. (See Ex. S, February 7, 2018 email re. Athletically-Related Income disclosure requirements and form.) But Dr. Heinel erred on the side of caution and disclosed the income under "speaking engagements" – the same category she had used in the past to disclose her income related to CTC – but this time included the notation that it was specifically for "Clear the Clearinghouse." (See Ex. T, 2017 and 2018 Athletically-Related Income disclosures.)

degree in business administration with the goal of selling CTC had come to fruition; she believed she had succeeded.

Further to her commitment to provide consulting services, Dr. Heinel researched various NCAA issues for Singer (see e.g., Ex. R, Singer and Heinel text messages re. CTC, at 12-13) and helped brainstorm with him as he built out a potential partnership with Nike. (See Ex. W, June 16, 2018 Heinel/Singer recorded call transcript – Call 1 (Singer: "And I just wanted to get some advice, and we definitely, we would like you to be a part of it, so here's what's happening…um Nike came to me and said hey, how can we change [the collegiate basketball requirements…"); Ex. X, June 16, 2018 Heinel/Singer recorded call transcript – Call 2 (in which Heinel and Singer discuss his plans for a basketball academy and Heinel asks pointed questions about his future plans and how she could assist him); Ex. Y, Dr. Heinel handwritten notes of calls and work with and for Singer.) Singer and Wright discussed Dr. Heinel's further involvement in the project. (See e.g., Ex. AA, July 2, 2018 Singer/Wright recorded call transcript (annotated).) And Dr. Heinel and Phil Wright consulted on the Counting Stars project. (See Ex. Z, Phil Wright voicemail.)

Although Dr. Heinel asked for it, Singer never provided a contract for the sale of Dr. Heinel's business or for her consulting work. (See Ex. R, Singer and Heinel text messages re. CTC, at 9; Ex. U, June 19, 2018 email thread between Dr. Heinel Singer and his business managers regarding Dr. Heinel becoming a consultant and the need for a contract).) Dr. Heinel didn't actively pursue it – she trusted Singer and he paid her on time every month. (See e.g., Ex. N, Oct. 24, 2018 Heinel/Singer recorded call transcript, at 4 ("I trust you implicitly").)

Dr. Heinel rejects that the payments were bribes as the government alleges. (See Ex. A, Dr. Whiting Report, at 10.) For the three years prior to her receipt of personal payments from

Singer, Dr. Heinel was already presenting Singer's students to SUBCO for nothing in return to her personally. And since 2010, as SAAD, Dr. Heinel had been presenting prospective walk-on students to SUBCO who had development potential for university advancement, the development office of the athletic department, legacies, and friends of USC. However, in hindsight, Dr. Heinel recognizes now that Singer probably offered to buy her business so that she would continue to present his students to SUBCO without issue.[19] Singer knew how to manipulate Dr. Heinel – he knew she had gone back to school so that she could learn how to grow her business with the goal of maybe even someday selling it. (See Ex. O, November 5, 2018 email with class plan and presentation; Ex. P, March 30, 2016 email with presentation.) And he knew Dr. Heinel revered his business sense so much that she put him on her CTC advisory board for her school project. (Ex. P, March 30, 2016 email with presentation.) He knew offering to bring her into the fold, to buy her business, to have her consult for him right at the perfect time when she was in fear over losing her job would be a hook for her and she took the bait. (See Ex. D, Sept. 27, 2018 Singer Interview Report (in which Singer tells the FBI "…HEINEL was worried that she would lose her job because a new athletic director was hired").)

Singer began cooperating with the government about two months after the payments to Dr. Heinel started. As indicated below, he has provided conflicting and irrational reasons for the payments.

//

//

---

[19] Just several months prior, several high school counselors contacted USC regarding the athletic abilities of several of the Singer students Dr. Heinel presented to SUBCO. (See PSR ¶¶ 171-173.)

### F. Singer's statements to the government regarding the $20,000 a month are contradictory and illogical

Singer obstructed justice once he began actively cooperating with the government. He deleted text messages, had a secret burner phone, secretly met with at least one defendant, and tried to arrange additional meetings with others unbeknownst to law enforcement at the time. Nonetheless, the government appears to take Singer's representations of why he was paying Dr. Heinel $20,000 a month at face value even though his varied explanations conflict and don't make sense. (See table below.)

As a starting point, when Singer first began cooperating, he told agents Dr. "Heinel recently started a compliance company, which evaluates students for sports. Heinel performs the compliance work for Counting Stars. Counting Stars was one of CHS' companies. ***Heinel was compensated for her compliance work, and was never paid any other way.***" (Ex. BB, Sept. 21, 2018 Singer ROI - annotated (emphasis added).) Only once he presumably learned the value of his cooperation did his story change, and it continued to change each time he spoke to agents about Dr. Heinel.

| Date of Contact/Cite | Statement |
|---|---|
| Sept. 21, 2018 | HENIEL recently started a compliance company, which evaluates students for sports. HEINEL performs the compliance work for COUNTING STARS. COUNTING STARS was one of CHS' companies. ***HEINEL was compensated for her compliance work, and was never paid any other way.*** (Ex. BB, Sept. 21, 2018 Singer ROI - annotated (emphasis added).) |
| Sept. 27, 2018 | In the fall of 2017, ***Singer agreed to pay Heinel personally (instead of USC accounts) because Heinel had raised too much money for one program***. (Ex. CC, AUSA Notes of Singer Interviews - annotated (emphasis added).) |
| Sept. 27, 2018 | ***At the beginning, HEINEL was not personally taking her share of the money. In CHS's mind he/she was holding $400,000 for HEINEL for her share for getting students into USC.*** HEINEL knew that she was |

| | |
|---|---|
| | owed money from CHS because they had a conversation about it. In the late fall or spring 2017, CHS had a conversation with HEINEL about her money. HEINEL wanted to take $100,000 to $200,000 out all at once but CHS told her it was not smart to do so. ***CHS offered HEINEL a consulting job at Counting Stars.*** HEINEL did not perform any consulting services but received $20,000 a month…<br><br>(Ex. D, Sept. 27, 2018 Singer ROI - annotated (emphasis added).) |
| Dec. 13, 2018 | Of the $400,000 owed to HEINEL, ***$200,000 was related to HEINEL helping the ABDELAZIZ*** family; ***$50,000 from the*** ▮ family (for ▮▮▮); ***$100,000 for the*** ▮▮ family (because ▮▮ was hard to get in) and ***$50,000 from the ISACKSON*** family (for ▮▮). (Ex. DD, Dec. 13, 2018 Singer ROI - annotated (emphasis added).) |
| Nov. 26, 2019 | of the $300,000 that GAMAL ABDELAZIZ wired to The Key Worldwide Foundation, CHS was going to pay DONNA HEINEL $200,000 and keep the $100,000…<br><br>CHIS subsequently agreed with HEINEL to redirect a total of $400,000 to HEINEL personally, in monthly installments of $20,000 in exchange for his assistance in securing the admission of ABDELAZIZ's daughter and the children of CHS's other clients; and<br><br>Half of the agreed-upon $400,000 payment was for HEINEL'S assistance with ABDELAZIZ's daughter.<br><br>***CHS offered HEINEL $200,000 because ABDELAZIZ's daughter was such a bad student and CHS thought that she might be tough to get into USC.*** ABDELAZIZ's daughter was not a legitimate player. She was a bad player.<br><br>(Ex. EE, Nov. 26, 2019 Singer ROI – annotated (emphasis added).) |
| PSR ¶ 48 (emphasis added) | By in or around 2017, ***Heinel was bringing in so much money from Singer's clients that she and Singer agreed they would set aside some of the money to go to Heinel directly, rather than to USC.*** Heinel and Singer entered into a sham consulting agreement pursuant to which, beginning in July 2018, Singer directed payments of $20,000 per month to Heinel personally. |

| | |
|---|---|
| PSR ¶ 170 (emphasis and space added) | Unlike many of Singer's clients, who made payments both to KWF (typically in the amount of $200,000) and to a USC athletic fund (typically in the amount of $50,000) in exchange for their children's admission, the parents of ▮▮▮ *Abdelaziz,* ▮▮▮ *Isackson,* ▮▮▮ *, and* ▮▮▮ *did not make payments to USC. Rather, Singer earmarked a portion of the funds* they paid to KWF *to be paid to Heinel personally.*<br><br>Specifically, of the $300,000 that Gamal Abdelaziz paid to KWF, Singer agreed to direct $200,000 to Heinel. Similarly, *of the $250,000 paid to KWF by Bruce Isackson,* ▮▮▮ father, who has not been charged), *and* ▮▮▮ , who has not been charged), *Singer agreed to direct $50,000 for each to Heinel.* |
| PSR ¶ 179 (emphasis added) | . . . ▮▮▮ thereafter made a $300,000 payment to KWF, *$50,000 of which Singer agreed to pay to Heinel personally.* |

In essence, Singer's shifting narrative indicates that Dr. Heinel was paid for her consulting services and never paid for anything else, but then, although Dr. Heinel didn't take any money personally in the beginning, Singer had in his mind that he was setting aside $400,000 for Dr. Heinel. Then, Dr. Heinel and Singer agreed that because she was *raising too much money for the accounts she was supposed to be raising money for at USC*, that the money would just go to her personally instead. Later, the $400,000, rather than just being a number in Singer's head he was setting aside for Dr. Heinel shifts to a specific composition of money from students who hadn't yet or ultimately ended up not making donations to USC - $200,000 for Abdelaziz (accepted/admitted nine months prior to the start of the $20,000 payments (PSR ¶ 141)) because, for some reason, she was more "tough to get in," $100,000 for ▮▮▮ (accepted/admitted ▮▮▮ prior to the start of the $20,000 payments (PSR ¶ 179)[20]) "because

---

[20] This narrative also contradicts what Singer and Mr ▮▮▮ discuss on a surreptitiously recorded call in which it is clear the agreement is that Mr. ▮▮▮ will pay Singer $250,000 and *donate* $50,000 to USC. (PSR ¶ 179.)

he was hard to get in," and then $50,000 each for ██ (accepted/admitted ███████ prior to the

start of the $20,000 payments (PSR ¶ 167)) and Isackson (accepted/admitted seven months prior

to the start of the $20,000 payments (PSR ¶ 161)). The offense conduct then offers a different

explanation for the $400,000: $200,000 for Abdelaziz, and then $50,000 each for Isackson,

█████████████████ which doesn't even equal $400,000). (PSR ¶ 170.) Later on, the offense

conduct makes reference to Singer agreeing to pay $50,000 of the $300,000 he received for

█████████ to Dr. Heinel personally. (PSR ¶ 179.)

Not only are the representations made by Singer and contained in the offense conduct

regarding the $20,000 inconsistent, but the concept that Dr. Heinel brought to USC so much

money from Singer's clients and/or for one account that Singer and Dr. Heinel agreed money

would go directly to Dr. Heinel instead isn't even borne out by the facts. Subsequent to Dr.

Heinel's receipt of the $20,000 monthly installments, Singer's clients *all* continued to send

donations to USC after the students had been admitted to the University, including █████████

(PSR ¶ 192), ███████ (PSR ¶ 203), Janavs (PSR ¶¶ 206, 208) and Huneeus (PSR ¶ 211). In fact,

*every* family of the students who Dr. Heinel either advocated for as a VIP (███████) or

presented to SUBCO for admission (███████, Janavs, Huneeus) after she began receiving the

$20,000 a month made donations to USC. (PSR ¶¶ 192, 203, 206, 208, 211.) And none,

according to Singer's shifting statements to the government, made payments which were then

routed to Dr. Heinel personally.

Singer's conflicting explanations for these payments make no sense. On the other hand,

Dr. Heinel's truthful explanations do, especially given her perceived job instability and concerted

efforts to prepare her business for sale which were seized upon by Singer to exploit her hopes

and dreams.

### G.  Many of the more substantive changes that Dr. Heinel made to athletic profiles were based on information she had received from Singer who she "trusted implicitly"

Over the three years Dr. Heinel knew Rick Singer and accepted his student candidates for presentation to SUBCO, Dr. Heinel had come to trust Singer implicitly. He regularly brought to her, and with increasing frequency, what she believed to be viable SUBCO walk-on candidates with substantial donor potential.

While Dr. Heinel takes full responsibility for her conduct, the government, at times, sweeps too broadly in its representations of Dr. Heinel's offense conduct, and overlooks and/or misstates several crucial facts which bear noting. The forensic images of Singer's cellphones showed that he deleted over 1,300 text messages *after* he began cooperating with the government which therefore weren't captured when the government imaged his phones. (See Ex. FF, *United States v. Abdelaziz*, Case No. 19-cr-10080, Sept, 17, 2021 trial transcript (excerpt), at 101:14-20.) Those deleted text messages, which Dr. Heinel still retained on her phone, reflect numerous instances in which Singer provided further information on students Dr. Heinel presented to SUBCO which Dr. Heinel then shared with admissions. Contrary to the representations made in the offense conduct, Dr. Heinel did not just make the information up herself. It came from Singer who she trusted implicitly.

//

//

//

//

//



//

//

//



//

//

//

//







(Ex. GG, Singer and Heinel text messages re. student information.)

The text messages that seem to pick up from a previous conversation are explained by the numerous phone calls Dr. Heinel and Singer had during the relevant time-period which are unaccounted for in the offense conduct. The government fails to account for the fact that prior to the wiretap on Singer's phone on June 5, 2018, Singer and Dr. Heinel engaged in **102** calls

totaling over **5 hours** with each other and exchanged **78** voicemails.[21] (See Ex. HH, Singer,

Heinel phone chart.)[22] In total, they engaged in **217** calls and exchanged **95** voicemails during

the relevant time-period, the majority of which were not captured by the government. (Id.) Of the

approximate 24 students that Rick Singer sent to Dr. Heinel as prospective athletes for admission

through SUBCO, Dr. Heinel and Rick Singer discussed 21 of those students before Singer's

phone was tapped and he started cooperating. In those discussions, Singer responded to Dr.

Heinel's questions and gave Dr. Heinel additional information regarding the student athletes,

including his representations that the USC coaches had an interest in those athletes.

### H. This Court's Memorandum and Order is relevant to a fair and just analysis of the nature and circumstances of the offense

Also of significance in evaluating the nature and circumstances of the offense is this

Court's September 15, 2022 Memorandum and Order in connection with Defendant Vavic's

Renewed Motion for Judgement of Acquittal or, in the alternative, Motion for a New Trial. (Dkt.

No. 1405.) In the Memorandum and Order, this Court determined that to establish a violation of

the duty of honest services when a payment is made to a third party, the subjective value to the

employee of the payment must be demonstrated. "Payment made to a university to which the

employee owes a duty of honest services may constitute a thing of value to the employee based

on the value placed on it by the employee only…if the payments are made for the employee's

---

[21] It is also bears noting that the government offense conduct indicates Dr. Heinel unilaterally changed ███ Giannulli's profile photo from the one Singer sent her. (See PSR ¶ 149; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter, at 1-2, Ex. A.) This is incorrect. The first version of the profile Singer sent Dr. Heinel had the same photo as the one in the final profile Dr. Heinel presented to SUBCO. (See Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter, at 1-2, Ex. A.)

[22] The underlying phone records supportive of the summary phone chart were produced to the government on November 2, 2021 as reciprocal discovery and will be provided to the Court upon its request.

own interests and receipt of the payments is contrary to the university's interest." (Dkt. 1405 at 55.)

The November 5, 2021 colloquy between the Court and Dr. Heinel at her Rule 11 hearing established that Dr. Heinel, who owed a duty of honest services to USC, misled SUBCO into believing that the information contained in the athletic profiles was provided by USC coaches. (Dkt. No. 1019 at 43: 20-25.) As this Court recognized at the hearing, "if what Dr. Heinel did was to give false information to USC, I understand why that's a terminable offense for her employment. And I understand why USC has been deprived of her honest services." (Id. at 45:7-11.)

Based on the Court's analysis, Dr. Heinel's conduct constitutes honest services fraud although the line between what constitutes a terminable offense, and what constitutes a federal felony, is somewhat blurred under these circumstances. Dr. Heinel made misrepresentations to SUBCO because she personally valued the donations that were made to the WAB because she was primarily responsible for its fundraising and believed her failure to do so would negatively impact her employment. And admission of these students under these circumstances was contrary to USC's interests because members of SUBCO would not have admitted the students if they had known the information presented to them was not obtained from the coaches or was untrue. (Id. at 64:1-7.)  In this respect, Dr. Heinel's conduct is similar to that of John Vandemoer (Case No. 19-cr-10079-RWZ) and is equally deserving of a sentence of probation.

## I.   Conclusion

When put into context, the nature and circumstances of the offense demonstrate the inherent conflict of Dr. Heinel's multiple positions at USC – fundraiser on the one hand and neutral presenter of student-athletes for admission on the other. The nature and circumstances of

the offense also show how and why Dr. Heinel was unwittingly manipulated by Singer. She certainly "got caught up in fulfilling what she believed was her contribution to the admissions process, by manipulating information and strengthening packets for submission to SUBCO" for the students brought to her by Singer, but Singer also took advantage of and exploited Dr. Heinel's proclivities – for his own financial benefit and later, once he started cooperating with the government, for the benefit he would derive in the form of a reduced sentence. (Ex. A, Dr. Whiting Report, at 12.)

The nature and circumstances in this particular matter also demonstrate that what constitutes a terminable offense for employment purposes and what constitutes a federal felony for penal purposes is not that far apart and is primarily distinguished by the value Dr. Heinel personally attributed to her fundraising obligation for the WAB.

Given the offense conduct as a whole, a non-custodial sentence at the low end of the Guidelines with a substantial community service component is merited.

## IV.    THE HISTORY AND CHARACTERISTICS OF DR. HEINEL FURTHER SUPPORT A NON-CUSTODIAL SENTENCE

### A.  Dr. Heinel's dedication to her community and education

Despite the tremendous amount of pressure and exceedingly long hours Dr. Heinel worked at her job, she was and is "one of those rare individuals who had mastered the ability to juggle career and parenting with grace and talent[.]" (Ex. F, Character Letters, K Willow Love.) Dr. Heinel not only put her whole heart into her job, she somehow always found the time and energy to dedicate that same level of passion and commitment to her community and to her children. The contributions Dr. Heinel has made to society separate and apart from her job at USC where she also helped countless students, and to her children, are worthy of recognition and serve to put the offense conduct into perspective with Dr. Heinel's life as a whole.

Dr. Heinel's passion for higher-education and making it accessible to everyone despite their background or socioeconomic status spilled over from her work at USC to her personal life and community involvement. Numerous letters submitted on Dr. Heinel's behalf talk about the positive impact she had on their children, grandchildren or themselves personally in their perception, access and success in education. As Dr. Heinel's wife, Rachel Heenan, writes, "[a]n expert in her field, she has volunteered to help numerous first-generation students/families understand the college admission process, including the ACT/SAT, NCAA eligibility process, and the ensure that every student can reach their full, college potential." (Ex. F, Character Letters, Rachel Heenan.) Longtime friend, Trini Jones, puts color to Ms. Heenan's statement. She discusses how Dr. Heinel helped her older daughter with her college essay and how, when that same daughter struggled with her first year at USC, Dr. Heinel "took her to lunch, sent her texts, and encouraged her to get more involved in the things she loved." (Id. at Trini Jones.) Dr. Heinel's mentorship worked, and Ms. Jones' daughter found her place at USC and is now in the workforce. (Id.)

Dr. Heinel' sister-in-law, Maria Murray, recalls when her husband passed away and she was struggling to take care of her two children. (Ex. F, Character Letters, Maria Murray.) Ms. Murray and her family relocated from Florida to California where they stayed with Dr. Heinel and her family for seven months until they could get back on their feet. (Id.) The passion Dr. Heinel had for her job and helping her students succeed, especially those "who needed the most guidance, had no direction but had big dreams" was parlayed to her home life and Ms. Murray credits her children's academic success to the dinner table discussions they would have each night in which Dr. Heinel imparted her "never wavering support and passion for continued education" which "continues to be a great influence in their lives" to this day. (Id.)

Ms. Murray's daughter's recount of those same events is even more touching. (Id., Rachel Murray.) After her father passed away, Rachel recounts how her failures in school only became more extreme. (Id.) Rachel would call Dr. Heinel every weekend and talk to her about her educational struggles. (Id.) Recognizing Rachel's natural talent and witnessing her struggles, Dr. Heinel convinced Rachel's mother to relocate to California so she could be closer to family and Rachel could obtain a good education to turn things around. (Id., Maria Murray, Rachel Murray.) After her family moved in with Dr. Heinel's, Rachel recounts, "[t]he stability and kindness that my aunt provided me during this time allowed my passion for mathematics to flourish…Without my aunt's guidance, AP classes and college would not have been an option for me. The path I was heading towards in Florida would have left me lucky to have a high school degree. By the end of high school, my aunt continued to support me and my brother in finding the perfect college for our needs, filling out FASFA, and transferring our SAT and AP scores." (Id., Rachel Murray.) Rachel was admitted to California State University of Long Beach and received a full scholarship to complete her degree in math. "Not only did I receive a full scholarship, but I now had the education and opportunity I wouldn't have had if it wasn't for the love and support from [Dr. Heinel]." (Id.) Rachel's story is but one example of the impact Dr. Heinel has had on the academic and social development of numerous individuals who submitted letters on her behalf and on their children and grandchildren. (See id., *passim*.)

Dr. Heinel's longtime willingness to serve her community extends beyond academics. Twenty-seven-year prosecutor in the organized crime division, Steven Dickman, discusses in his letter, as is echoed by everyone else who submitted a letter on Dr. Heinel's behalf, how Dr. Heinel repeatedly and consistently goes out of her way to help those around her. (Id., Steve Dickman, *passim*.) For instances, "[w]hen COVID hit, Donna had [her daughter] ███████ go

37

through the neighborhood asking some of the older neighbors if they needed any shopping done." (Id., Steven Dickman.) Mr. Dickman expresses how stunned he was by the "brilliant simplicity of this idea" and how "[i]t helped [their] neighbors and instilled in the kids the importance of being involved in their community." (Id.) As retired 36-year-Assistant Chief for the Los Angeles County Fire Department, Van Madrigal, says, "[t]he only other person in this entire neighborhood to knock on [the elderly's] door unsolicited is Donna Heinel. Despite the hardship of her own ordeal, she somehow put her own concerns to the side to help…" (Id., Van Madrigal; see also id., Stacia Mancini.)

Reverend Olivia Grace Walker tells a story very similar to many of the others:

> More recently Donna assisted in caring for my elderly mother who had been diagnosed with dementia. When my mother started having balance difficulties Donna jumped right in and provided mini-movement sessions, chair exercises, and helped my mother complete her daily physical therapy regime. She encouraged my mom and made it fun, brightening her day and making sure she was eating and hydrating appropriately. She walked my mom's dog and washed her clothes. When Donna felt it was time for my mother to have a higher level of care she literally helped me pack my mother's belongings, took carload after carload of donations to Goodwill, and cleaned her apartment for me while I drove mom to her new home with me in Palm Desert, California. I'm sure it was Donna's care, connection, and love that extended my mother's life.

(Id., Reverend Olivia Grace Walker.)

Dr. Heinel is also heavily involved in the Neighborhood Watch, a hands-on member of the PTA and takes an active role with her son's Boy Scout Troop. (Id., Dalton Kaufman, *passim*.) Her "community is a better place with [Dr. Heinel] contributing. Wherever there is a hand needed, she is the first to come forward." (Id., Britt Sexton.) Her community trusts Dr. Heinel with their kids, admires her parenting ability, and respect her as a person. (Id., *passim*.) The letters of support resoundingly echo the aberrational nature of Dr. Heinel's offense conduct and how out of character it is for the person of integrity and honor they know so well. (Id.) And they

also all recognize the genuine remorse and sorrow Dr. Heinel has for her involvement in this crime. (Id.)

### B. Dr. Heinel's role as an irreplaceable caretake to her children is meritorious of a departure or variance to ensure a non-custodial sentence

The loss of financial support or caretaking to a defendant's children is a recognized basis for a departure under the Guidelines. See U.S.S.G. § 5H1.6 cmt. n.1(B); *United States v. Rivera-Maldonado*, 194 F.3d 224, 236 (1st Cir. 1999) (the fact that defendant's son had AIDS may warrant a departure due to exceptional family circumstances); *United States v. Sclamo*, 997 F.2d 970, 974 (1st Cir. 1993) (affirming downward departure based on the regression the defendant's child would suffer if defendant were incarcerated). It is also a recognized basis for a downward variance, especially when a defendant's children will be left without their primary caretaker. *Gall v. United States*, 552 U.S. 38, 59 (2007) (indicating that "compelling family circumstances" would justify a downward variance from the guidelines); *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (affirming 91-month downward variance based on defendant's close family relationships and support of his family, among other factors); *see also United States v. Baker*, 502 F.3d 465, 469 (6th Cir. 2007) (affirming sentence of five years' probation for possession of unregistered gun based on effect incarceration would have on defendant's older son); *United States v Lehmann*, 513 F.3d 805, 809 (8th Cir. 2008) (affirming probation for a felon in possession of a firearm based on the court's concern for the welfare of defendant's nine-year old son); *United States v. Munoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008) (affirming downward variance where defendant was the primary caretaker and sole supporter of his eight-year-old son and the sole support of his ailing parents).

Further, "[i]f the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by imprisonment, if there is no threat to the

39

community, and if society will ultimately benefit by allowing the defendant to care for his or her

family, a departure is warranted." *United States v. Gaskill*, 991 F.2d 82, 86 (3rd Cir. 1993). The

Court must determine "at what point . . . burdens are imposed on innocent dependents that are

simply not justified by our legitimate need to punish the wrongdoer, that are cruel and

unnecessary." *United States v. Pearson*, 282 F. Supp. 2d 941 (E.D. Wis. 2003).

Dr. Heinel has two children, ████, age 14, and ████████), age 12. (PSR ¶¶

254-55.) Both are straight A students who have been in advanced curriculum since they were in

sixth grade. (Id.; Ex. C, Dr. Heinel Letter; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR

Letter.) And both have been raised with a strong moral code instilled upon them by their mother

and primary caretaker, Dr. Heinel.[23]

---

[23] See e.g., Ex. C, Dr. Heinel Letter; Ex. F, Character Letters, ████ Heenan ("A big part of
Mimi's life was USC, but her main concern has always bee her family. She managed to balance
her work life and her personal life, in order to be there for my brother, my mom, and me. She
was still ways there for me before school to pack my lunch, and she still managed to have time to
help me with my math homework. …She has comforted me through every rough time in my life,
and always can find a way to make you feel better. Mimi has provided our family with so much
love and support, I can not imagine what my life would be like without this ray of sunshine
always there for me."), Steven Dickman ("First and foremost, Donna is an excellent mother and
role model for her children. Both kids are exceptionally well behaved, polite, and most
importantly – kind. They go out of their way to say thank you and offer to help to our neighbors
– especially the older ones."), Robert Henderson ("[Dr. Heinel] values education and has taught
the kids to always strive for good grades. I look up to her patience and skills in raising two fine
citizens. It breaks my heart to think that the kids will be without Donna for any amount of
time."), Dalton Kaufman (who recalls when he was a new parent, he and his wife would often
"have parenting questions and Donna would happily make herself available." "It was evidence
that Donna was raising her children to be honest, caring, empathetic and good citizens."), K
Willow Love ("I admired Donna for never allowing her very demanding job at USC to stand in
the way of her dedication to her son in the many activities at the school."), Stacia Mancini ("I've
had lots of experience with parents over my career and it is a rare and beautiful thing when you
find parents who encourage and support their children without pushing or coaching via criticism
and guilt….Donna and her spouse, both educators, are role-models for how to raise happy,
engaged, caring children. They taught them the importance of hard work, reading, focus, learning
from mistakes, step-by-step skill-building, helping others, being a team-player and doing your
best."), Rachel Murray "I have seen how Donna has chosen to raise her family, choosing
carriage, integrity, honesty, and kindness as her parenting pillars.), Shannon Paul ("Donna has

Dr. Heinel's wife, Rachel Heenan works more than full-time hours as the Director of Special Education for the Long Beach Unified School District. (PSR ¶ 253; Ex. C, Dr. Heinel Letter; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.) Ms. Heenan █████████ ████████████████████████████████████████ (Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.) She also suffers ████████████████████████████████ ████████████████████████ (Id.) Since their birth, Dr. Heinel has always been heavily involved in the upbringing and care of her children. But since her arrest and termination from USC in 2019, Dr. Heinel has assumed all of the primary caretaking responsibility for her children[24] – who are both at a critical age in their development, █████ just started high school and █████ is in middle school. (PSR ¶¶ 254-55.)[25] As Dr. Heinel's wife, Rachel Heenan, notes, "Donna is our children's primary caretaker. She is the "classroom mom", the cheer-leader on the sideline for their games, the Boy Scout mom, the transport to and from school, the support for their homework, their primary caretaker, and their emotional support from a bad (or good) day at

_____

raised two of the sweetest [and] well rounded kids…We can only hope that we raise such kind kids as both of them."), Britt Sexton ("Donna is raising ████████████ie to be loving, caring people. These are the type of children I want my kids to be influenced by. Education is important in Donna's family and because of her, both her children are good students and I see enjoy learning. I've watched Donna encourage them to explore their interests and has always had them in enrichment classes and extracurricular activities."), Douglas Sprague ("She has always been there for her two pre-teen kids, helping them grow up to be responsible adults."), Olivia Grace Walker ("Donna has always been an exemplary parent. She always worked hard to balance fun and responsibility with both her son and daughter and actively participates in their education and activities. She attends recitals, soccer games, Boy Scout meetings, and swim meets…. They are lovely, secure, and respectful children.")

[24] Dr. Heinel and Ms. Heenan had a nanny for the children prior to Dr. Heinel's termination from USC and are unable to afford a nanny now without Dr. Heinel's prior salary.

[25] Dr. Heinel also travels to Pennsylvania to help care for her 91-year-old mother who suffers from dementia and a weak heart. (See PSR ¶ 249; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.)

school. Donna is their Mom, their "Mimi". My children need their mom home. I need my wife

home." (Ex. F, Character Letters, Rachel Heenan; see also n. 23.) Loss of their primary caretaker

for any period of time – especially after the extreme trauma these children have already faced as

a result of this incident[26] – could have catastrophic effects and a long-term impact on their

emotional wellbeing and academic development. These children, at this point in their lives, need

to be with their mother. In Dr. Heinel's words, "Your Honor, I don't want to go to jail. Not

because I don't think I will survive but I don't feel my family will. These teenage years are the

most formative years in their lives and to be away from them for any length of time would have a

---

[26] The FBI pulled Dr. Heinel's children out of their bed and out of their house at gunpoint in the early hours of the morning and then hauled their mother off in a police car. Then the media frenzy started. (See Ex. C, Dr. Heinel Letter ("My daughter, ███████, took the brunt of my arrest. The FBI agent pointed a gun at her chest and scared her so badly she ████████████ ███. The trauma caused her nightmares and she couldn't sleep alone for two years. For myself, the image of the gun's red laser pointer on my daughter's pink unicorn pajamas will grate on my soul forever. I will never forgive myself."); Ex. F, Character Letters, Rachel Heenan ("Although Donna has lost her 'dream job,' the effect of this charge on our family is indescribable. From the moment the FBI stormed into our home that early March morning with guns drawn, red lasers and semiautomatic weapons pointed at our faces, to our children watching their mother being taken away in handcuffs, my children's/our lives have forever changed. As a result of this traumatic experience, our twelve-ear-old daughter has spent two years afraid to sleep in her own room, asking 'What if they come here again?' When someone knocks on our door loudly, our children freeze, not wanting to go to the door, overwhelmed by the fear that these events will be relived."), ██████ Heenan ("This trial, causing many tearful eyes and restless nights, has lasted much longer than it should have. I can still vividly remember the night, more than four years ago, when an entire FBI team had demanded Mimi at our door, putting my parents in handcuffs…This 'bad dream' has become our reality, always lingering in the back of our minds. I remember not being able to sleep alone in my own room for months after this happened, afraid it would happen again, and not knowing what was going on."), Steven Dickman ("The morning of her arrest, FBI agents were banging on her door announcing their presence for the neighborhood to hear. At gunpoint, she, Rachel, and the two children were then brought outside and forced to sit in the front yard while the FBI searched the house – and her neighbors drove by going to work. After they left, I stopped by to speak with Rachel. Their two children were stunned, very quiet, and were curled up in blankets sucking their thumbs."), Rachel Murray ("I watched my younger cousins turn into different people the night my aunt was arrested. The raid on their home was traumatic. The day this started was the day their lives were altered forever.")

devastating effect. It will reopen the scab of this trauma that has almost healed completely." (Ex.
C, Dr. Heinel Letter.)

This very real concern is shared by those who know Dr. Heinel and her children well and
wrote letters of support: "These children are in their most formative years and time away from
Donna will magnify any sentence exponentially." (Ex. F, Character Letters, John Sangmeister;
see also, Id. at Barbara Heinel ("Her two amazing children ███, who is interested in the
engineering field and ██████ who is very involved in theater and reading, would be harmed
significantly if my sister was not available to support them. I have witnessed the dedication in
guiding these young children to become responsible, loving, secure members of society."),
Vincent Carbaugh ("I can always see how deeply she loves and care for [her children]. I see how
devoted they are as a family….I lost my father when I was young and know, firsthand, how
devasting that separation can be on a child."), Dalton Kaufman ("Donna's children, ████ and
██████ are two of the sweetest and most grounded I have ever known. This situation has been
emotionally traumatic for both of them and I am very concerned for their mental health and well-
being."), K Willow Love ("Her children and the children of our community will experience a
grave loss if she is not there to help guide them as they travel through this very difficult time in
the development."), Rachel Murray, ("Her children are entering the most important years of their
lives…. I greatly fear that their lives will be completely altered if my aunt goes to prison, and
they will finish the treacherous path [of not finishing education] I never completed…. The loss of
a parent during the most important years of their lives is not something I or my family want to
see. This experience I know far too well [whose own father passed at age 15]…. I have had to
learn reconciliation and how to survive, two things I pray her children never have to learn during
this time in their lives."), Britt Sexton ("The effect on her well-adjusted productive 15-year-old

son and 12-year-old daughter would be devastating and forever life changing. These children would be broken.").)

Further, due to the loss of significantly over half of their income as a result of Dr. Heinel's termination from USC, Dr. Heinel and Ms. Heenan would be unable to afford after-school care for the children, leaving the family with few, if any, options for the care and supervision of the children. This would be especially pronounced if Dr. Heinel's present limited income was removed from the equation due to her incarceration.

Through all of this, Dr. Heinel's only concern has ever been the well-being of her children and the impact her poor decisions – and the result of those poor decisions – will have on them. As Van Madrigal, retired Assistant Fire Chief, put it, "[a] few days after she had pled guilty, I ran into Donna and we spoke about the case for the very first time. She was embarrassed, but she cared more about how this impacted her children. Because of her actions, their lives have been upended with both the media and social media being relentless and unkind.[27] She expressed to me how remorseful she was and to see the strain on her face was difficult to watch." (Ex. F, Character Letters, Van Madrigal; see also id. at Jeff Wood ("Although this situation was 'breaking news' in my school community [as Principal of ███ school], Donna demonstrated a continued commitment to her family and did not share any element of her situation with me until recently when she shared her ownership and responsibility for her actions."); PSR ¶ 264; Ex. C, Dr. Heinel Letter.)

There is no doubt the impact on her children will be great if their mother and primary caretaker is removed from the home – a situation which is especially pronounced considering the traumatic events these children have already faced as a result of the charges in this matter. Dr.

---

[27] See n. 26, *supra*; sec. V., B, *infra*.

Heinel is needed at home and in her community. A non-custodial sentence with a significant community service component fulfills the goals of sentencing and allows Dr. Heinel to continue to contribute in meaningful ways to those around her.

### C.  Dr. Heinel's remorse and post offense rehabilitation

The repercussions of Dr. Heinel's actions and the remorse she experiences every day are palpable. In her own words, "To think of myself as a part of another scandal at my beloved University is reprehensible. It is the first think that I think about in the morning and the last thing I think about when I try to go to sleep. I have moved on in many aspects of my life but I still can't forgive myself for this. I miss my USC family." (Ex. C, Dr. Heinel Letter.)

Despite her pain and internal strife, Dr. Heinel has marched on. Just six months after Dr. Heinel was arrested and terminated from her position at USC, she was able to secure employment as a director of sales and marketing for a small gourmet dog treat company called Eco Pawz. (PSR ¶ 267; Ex. F, Character Letters, Greg Mayor; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.) She earns a modest income but she has approached this opportunity with the same determination and passion she did with her position at USC. (See ids.) Consistent with Dr. Heinel's strong work ethic, EcoPawz CEO Greg Mayor explains that because of Dr. Heinel, their "sales have grown by over 20% annually…[and that] [t]hrough her professionalism and drive, [Dr. Heinel] has achieved and surpassed all the goals" he has set. (Ex. F, Character Letters, Greg Mayor.) Mr. Mayor – as her current employer – is uniquely qualified to comment on Dr. Heinel's rehabilitation. He states, "[i]t is hard for me to reconcile her charges as over the past 2 ½ years I have not seen one iota of any malfeasance, quite the opposite. She plies her trade with a graceful professionalism and is well respected by me and the customers she handles. Her

moral character is beyond reproach and the crimes she is being sentenced for are impossible for me to believe." (Id.)

Dr. Heinel has also worked hard to better understand where she went wrong and to better comprehend the legal ramifications of her actions. From June 2020 to August 2021, Dr. Heinel attended and completed the University of California at Irvine paralegal certificate program. (PSR ¶ 266.) She earned a 4.0 GPA and was awarded a scholarship for paralegal education. (PSR ¶ 266; Ex. F, Character Letters, Barbara Heinel.)

Realizing the wrongs of her ways, Dr. Heinel not only accepted responsibility but proactively sought to assist the government by providing her insight and knowledge of others at USC who were engaged in similar malfeasance.[28] She shared what she knew about Jovan Vavic with the government prior to the trial and was ready to testify if the government found value in what she shared.[29] And although the government ultimately was not interested in further information on others at USC and did not find her information on Mr. Vavic meritorious of a § 5K1.1 departure, Dr. Heinel has remained willing and ready to provide assistance.

## V.   A NON-CUSTODIAL SENTENCE FULFILLS THE GOALS OF SENTENCING

### A.  The seriousness of the offense, promoting respect for the law, providing just punishment all support a non-custodial sentence

The seriousness of the offense must be viewed through a wide-eyed lens which takes the full nature and circumstances of the offense into account. Importantly, while Dr. Heinel's

---

[28] It is anticipated the government will counter that Dr. Heinel did not accept responsibility until ten days before she was scheduled to start trial. Dr. Heinel has always been willing to accept responsibility for her own conduct at USC but has rejected the allegation that she conspired with Rick Singer and others. Ultimately, when the opportunity presented itself for her to take responsibility for what she did, as opposed to what the government believed she did, she took that responsibility.

[29] The government requested an attorney proffer which was held on February 1, 2022.

conduct most certainly caused harm to the integrity of the admissions process, as Probation

noted, there are "no identifiable victims of this offense" and there is "no evidence to indicate that

USC, or any other individual or entity, suffered an actual financial loss." (PSR ¶ 220.)

Consequently, the goals of promoting respect for the law and providing just punishment must be

weighed against this factual backdrop.

> ### B.  The severe collateral consequences Dr. Heinel and her family have already suffered provide sufficient deterrence

The collateral consequences already suffered by Dr. Heinel and her family as a result of

the charges in this matter afford adequate deterrence to criminal conduct. (See n. 26, *supra*.) She

was terminated from her position at USC immediately following her arrest. (PSR ¶¶ 269, 271.)

Due to the nature of the offense conduct, Dr. Heinel will likely never be able to work in an

educational system again. Because of her position at USC and the students she presented to

SUBCO whose well-known and wealthy parents were also indicted in companion cases, the

media in this case has been particularly relentless concerning Dr. Heinel and her family. For

instance, Dr. Heinel briefly drove for Uber after she was terminated from USC. (PSR ¶ 268; Ex.

F, Character Letters, Steven Dickman; Ex. II, July 5, 2022 Dr. Heinel Objections to PSR Letter.)

"A local television station apparently learned about this and followed her through the

neighborhood, hounding her on camera to 'tell the public what happened.' The station then set

up another reporter to take an 'undercover' Uber ride with her…. This 'report' was broadcast on

local television headlined 'Former USC Administrator Caught-Up in USC Admissions Scandal

Now Driving for Uber.'" (Ex. F, Character Letters, Steven Dickman.) Twenty-seven-year

Deputy District Attorney Steven Dickman laments:

> Donna is a very accomplished person who rose to the top of her field. Her very
> public fall and the continued and constant public humiliation, has been
> devastating for her and her family. Of course, it was her own conduct which

caused this, but the media feeding frenzy and constant humiliation long ago
exceeded all bounds of proportionality when weighed against her criminality.
I've prosecuted well over 50 murder defendants – none of them has been so
thoroughly ground into the dust and publicly humiliated as Donna.

(Id.; see also n. 26, *supra*.)

Dr. Heinel has already learned grave lessons with profound consequences which more
than sufficiently serves the purpose of both specific and general deterrence. An additional
punishment of a custodial sentence is not necessary under these circumstances.

### C.  The kinds of sentences available, avoidance of disparity

Seven out of 12 of Dr. Heinel's co-defendants have received non-custodial sentences.
(See PSR ¶ 6; *United States v. Ernst, et al.,* Case No. 19-cr- 10081.) And the defendants'
sentences in the companion matters have ranged from time served to several weeks to several
months given the specific facts of each case. (See PSR ¶¶ 7-22.) The Guidelines range here of
zero to six months, the nature and circumstances of the offense when viewed as a whole,
especially when compared to that of John Vandemoer and the sentence of probation that he
received, in addition to the history and characteristics of Dr. Heinel and the impact a custodial
sentence would have on her family all tip in favor of a non-custodial sentence with conditions.

## VI.    CONCLUSION

Based on the Guidelines range of zero to six months and the foregoing unique
combination of factors, it is respectfully requested that this Court impose a non-custodial
sentence with conditions, including significant community service, to achieve the goals of
sentencing in this case.

Dated: November 22, 2022     Respectfully submitted,


            */s/ Nina Marino*
            NINA MARINO
            JENNIFER LIESER
            (Admitted *pro hac vice*)
            KAPLAN MARINO, P.C.
            1546 N. Fairfax Avenue
            Los Angeles, CA 90046
            Telephone:  (310) 557-0007
            marino@kaplanmarino.com
            lieser@kaplanmarino.com

            *Counsel for Defendant Dr. Donna Heinel*




## CERTIFICATE OF SERVICE

   I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 22, 2022.


             */s/   Nina Marino*
            NINA MARINO
            Counsel for Dr. Donna Heinel