UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-10081-IT |
| | ) | |
| DONNA HEINEL, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Donna Heinel, a senior athletic department administrator at the University of Southern California ("USC"), partnered with William "Rick" Singer to defraud USC and became one of the most prolific and culpable participants in Singer's athletic recruitment scheme. Heinel abused her position as the liaison between USC's athletic coaches and the subcommittee on athletic admissions ("Subco") by misleading the committee into approving the admission of approximately two dozen Singer applicants as purported athletic recruits when, in reality, the coaches had not recruited them and some did not even play the sport they were purportedly being recruited to play. Heinel falsified the applicants' athletic credentials, tried to avoid detection, and – when the university began to catch on – lied to cover her tracks. She did all of this in exchange for payments from Singer and his clients, first to USC athletic funds she oversaw totaling more than a million dollars, which advanced her career and increased her stature within the athletic department, and, later, $160,000 to her own pocket disguised as consulting fees. Heinel's conduct spanned four years and became progressively more egregious. By 2017, she was selling as many as a dozen recruitment slots to Singer in a single year for approximately $50,000 a pop. When high school counselors, surprised to learn that USC admitted these students as athletic recruits, began to raise

red flags, Heinel was undeterred. She doubled down, came up with more lies to fool admissions into believing the applicants were legitimate recruits, and then continued selling slots to Singer until the time she was arrested in March 2019. For her actions, the government respectfully recommends that Heinel be sentenced to a term of 24 months in prison and 24 months of supervised release and that she be ordered to forfeit $160,000 in criminal proceeds.

## I.      Overview of the Offense Conduct

Heinel's involvement in the "side-door" scheme began in early 2014, when former USC assistant soccer coach Laura Janke asked her to facilitate the admission of a Singer student as a soccer recruit in exchange for a purported donation from the student's father, and Heinel agreed. PSR ¶¶ 53-56. In early 2015, Janke again reached out to Heinel on behalf of Singer, this time seeking her assistance in facilitating the admission of defendant Douglas Hodge's son. *Id.* ¶¶ 57-70. Once Janke assured Heinel that she trusted Hodge – that he had the money and was "good for it" – Heinel agreed and falsely presented Hodge's son to Subco as a football recruit in exchange for a $75,000 payment to the Women's Athletic Board ("WAB") fund. *See id.* When a USC admissions official later asked if athletics was supportive of Hodge's son's request to defer his admission, Heinel responded, falsely, "Yes they are," *id.* ¶ 70, despite the fact that she knew, at that moment, that he had not in fact been recruited by the football coach, there was no prospect of him joining the team, and he had no intention of doing so.

When Heinel learned about Singer later in 2015 and was told to "steer clear" of him by USC's dean of undergraduate admissions, she asked Janke if Singer had "deliver[ed] Doug Hodge to [her]." *Id.* ¶¶ 71-73. Heinel feigned skepticism of Singer, telling Janke that she "want[ed] to protect the process, keep the highest integrity, and protect the trust of admissions that [she] ha[d] spent 13 years cultivating." *Id.* ¶ 73. To her colleagues in the athletic department, Heinel feigned

legitimacy, warning them that Singer "takes money from rich parents and promises to 'deliver' admission to USC by being a [w]alk-on" and asserting that she had been "trying to curtail [Singer's] influence." *Id.* ¶ 74. That was a lie. In fact, Heinel started working with Singer directly, cutting Janke out as the middleman and ensuring that the "money from rich parents" went to the WAB fund she oversaw, rather than to athletic teams' gift accounts. *Id.* ¶ 75 *et seq.*; *see also id.* ¶ 79 n.8.

From early 2016 on, Heinel facilitated the admission of nearly every applicant Singer sent her way. In most instances, she used the guaranteed route: presenting the students to Subco as purported athletic recruits. When that was not feasible – for example, in the case of an applicant who had been denied through the regular admissions process (*i.e.*, had not gone through Subco originally) and was appealing the denial, *see id.* ¶¶ 120-21 – Heinel designated Singer's students as "VIP" applicants, thereby increasing their chances of admission. Whether it was for a conditional admission letter (sent to recruits to notify them that Subco had approved their admission) or a VIP designation, Singer's clients paid handsomely: typically $50,000 but as much as $100,000 per student. Singer and his clients initially directed the payments to whichever USC athletic fund Heinel instructed, typically the WAB fund. *Id.* ¶ 46. Those payments ultimately totaled approximately $1,275,000.

By in or around 2017, Heinel was bringing in so much money from Singer and his clients that she and Singer agreed they would set aside $400,000 to go to Heinel directly, rather than to USC. *Id.* ¶ 48. *See also id.* ¶¶ 170, 179, 214. They entered into a sham consulting agreement pursuant to which, beginning in July 2018, Singer directed payments of $20,000 per month – ultimately totaling $160,000 – to Heinel's company, Clear the Clearinghouse, all of which ended up in Heinel's personal bank account. *Id.* ¶ 48. Heinel disclosed the money she received from Clear

the Clearinghouse to USC but falsely categorized the type of "outside athletically-related income" as income from "speaking engagements." *Id.*

In at least one instance, Heinel accepted payments to falsely present an applicant outside of Singer's scheme to Subco as a purported athletic recruit. As described in detail in the PSR, Heinel coordinated with two of her co-defendants, former USC soccer coach Ali Khosroshahin and former University of California, Los Angeles ("UCLA") soccer coach Jorge Salcedo to facilitate the admission of an applicant to USC as a purported baseball recruit in exchange for two $50,000 payments to the WAB fund. *Id.* ¶¶ 52, 83-102. Heinel told a series of lies to secure the applicant's admission, knowing that he was not a "legit recruit." *Id.* ¶ 102 n.10. She claimed that the baseball coaches were interested in having the student walk on and – to hurry the process along after being assured by Khosroshahin that she would receive $50,000 upon admission and another $50,000 the following year, and that the family was "good for it" – she asserted that a couple of other teams were "still after him and baseball d[id]n't want to lose him." *Id.* ¶¶ 90, 94-95.

To secure Subco's approval, Heinel made these applicants appear to be legitimate recruits – that is, high-caliber players who had been selected by USC's athletic coaches. In coordination with her assistants, Heinel revised the falsified athletic profiles she received from Singer (nearly all of which were created by Janke) to make the students appear to be more accomplished athletes and added fabricated narratives, written as if they were coming from the coaches, to describe the ways in which the applicants were expected to contribute to USC athletics. *See, e.g.*, *id.* ¶ 106. For example, below is a side-by-side comparison of the profile Janke created for Sabrina Abdelaziz and the profile that Heinel presented to Subco. Heinel not only switched the photographs, substituting one that she apparently pulled from an online article about the basketball team at

Sabrina's high school, but also increased Sabrina's height from 5'8" to 5'10". *Id.* ¶ 140. *See also id.* 149, 205.



In March 2018, USC admissions officials emailed Heinel about several Singer students "whose high schools were quite surprised to hear they were being admitted as athletic recruits." *Id.* ¶ 171. In response, Heinel falsely assured admissions that they were legitimate recruits, coming up with invented explanations for why the students' athletic talents might not have been on their high schools' radar. *Id.* ¶¶ 172-73. For example, Heinel told the director of undergraduate admissions that one student's high school did "not sponsor water polo," so he played on a club team during the year and "travel[ed] internationally during the summer with the youth junior team in Italy," and claimed that he had met then-USC water polo coach Jovan Vavic on one of those overseas trips. *Id.* ¶ 173. In fact, the student did not play water polo at all and had never met Vavic. Heinel kept Singer in the loop on her lies so that they had their stories straight, and she advised him that, to prevent issues going forward, the students needed to stay involved with the sport, register with the NCAA, and, "if questioned" by their high schools, "respond in an appropriate

way." *Id.* ¶¶ 173-74. Heinel also told Singer that if any of the parents "created a disturbance" in the way Mossimo Giannulli did after learning that his daughter's high school counselor had advised USC that she was not a serious crew participant, it would "shut everything down." *Id.* ¶ 174. With that statement, Heinel demonstrated once again, in unambiguous terms, that she knew that her conduct with Singer was illicit, that USC did not approve of it and would not allow it, and that the scheme existed to benefit Heinel and Singer – not USC.

Having allayed the concerns raised by the admissions department, Heinel carried on with Singer as before, *id.* ¶ 175 *et seq.*, although with a heightened awareness of the risk of detection. *See, e.g.*, *id.* ¶¶ 193 (Heinel telling Singer that she was going to present an applicant as a beach volleyball as opposed to an indoor volleyball recruit because her high school did not have a beach volleyball team so "if she's not very good in indoor . . . that's OK because she might be the standout at beach, and . . . no counselor would know that"), 198 (Heinel suggesting that Singer hold off on telling the families of two applicants that Subco had approved their admission because she was "worried about those counselor[s]" and saying they could "wait a little while" on the payments because she did not like "to do it . . . so close"), 206 (Heinel telling Singer that she wanted to make sure Agustina Huneeus was "known as a water polo player" because "they . . . Googled her and knew her father was in the wine business"), 218 (Heinel notifying Singer via text message that Agustina needed to confirm she was being recruited because her high school counselor had advised a USC admissions official that she did not believe that to be the case). Heinel sent the aforementioned text message to Singer approximately one week prior to her arrest.

## II.        The Applicable Sentencing Guidelines

Heinel pled guilty to Count 11 of the Second Superseding Indictment insofar as it charges honest services wire fraud.[1] The government submits that Heinel's total offense level under the Sentencing Guidelines is 21. That calculation reflects a base offense level of 7 under Section 2B1.1(a)(1); a 14-level increase based on the gain from the offense; a 2-level increase under Section 3B1.3, because Heinel abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense; and a 2-level decrease pursuant to Section 3E1.1 for acceptance of responsibility. The resulting Guidelines sentencing range is between 37 and 46 months. In this and the related college admissions cases, the Probation Office has taken the position that there was no evidence of actual financial loss or reasonably foreseeable pecuniary harm to the universities that were deprived of their athletic coaches'/administrators' honest services, and that as a result, gain cannot be used as an alternative measure of loss. The government objects to the Probation Office's conclusion, as it has previously.

## III.        Sentencing Recommendation

The government respectfully submits that the relevant factors under Section 3553(a) support the imposition of a meaningful sentence of incarceration that exceeds those imposed on all but one of the other athletic coaches/administrators sentenced in the college admissions cases. Heinel facilitated approximately two dozen phony recruitments, more than any other coach/administrator involved in the athletic recruitment aspect of Singer's scheme. While the other coaches/administrators who received significant prison sentences – namely, former Georgetown University tennis coach Gordon Ernst, who accepted nearly $3.5 million in bribes and received a

---

[1] Count 11 is based on the October 5, 2018 call between Heinel and Singer described in paragraph 198 of the PSR.

sentence of 30 months, and former UCLA soccer coach Jorge Salcedo, who agreed to recruit three Singer students in exchange for $200,000 – took all of the bribe payments personally, Heinel's involvement in the scheme was far more extensive than Salcedo's and her conduct more deceptive than Ernst's.

Like Ernst and the other coaches involved in the scheme, Heinel abused her position, but as the liaison to Subco, Heinel served as a gatekeeper in a way the coaches did not. Indeed, Heinel frequently implicated USC's athletic coaches in her lies to Subco and senior admissions officials. *See, e.g.*, PSR ¶¶ 120 (falsely claiming that a Singer applicant Heinel designated as a VIP had been brought to her attention by the women's tennis coach), 149 (falsely claiming that the men's tennis coach had made a typo in the athletic profile for one of Singer's students), 169 (falsely claiming that the men's tennis coach had asked her to check with admissions on the status of the application of another Singer student, asserting that the coach had seen the student play and intended to offer him a try out spot). In one instance, Heinel went forward with presenting a Singer student to Subco as a lacrosse recruit even after the coach told Heinel's assistant that the student was "not [a lacrosse] prospect." *Id.* ¶¶ 117-18. The athletic profile Heinel presented for that student falsely asserted that she "ha[d] the skill set foundation to earn a starting role on our team by her junior year." *Id.* ¶ 118.

Heinel also entangled her own subordinates in her lies. *See, e.g., id.* ¶¶ 116 n.11 (when asked by an admissions officer about a Singer applicant's deferral request, Heinel's assistant claimed that she had "just met with the basketball staff," that they were "aware of his request," and that it was "okay to defer him"), 136 (when an admissions officer suggested adding a rating scale to the information submitted to Subco for walk-ons, Heinel's assistant assured her, "we only take high caliber walk-ons from our coaches that we expect to be impact players," and claimed,

"we usually have [the coaches] rank the [prospective student-athlete] prior to us presenting them so we know their value to the team").

Although the other coaches involved in Singer's scheme also deceived their universities' admissions departments, Heinel's lies were more pervasive. For example, while Ernst falsely designated Singer's students as recruits, Georgetown did not require its coaches to submit athletic profiles in support of their recruits' applications, so in most cases there was no need to fabricate their athletic credentials. Heinel, on the other hand, not only presented the falsified athletic profiles of Singer's students, she added her own falsifications and fabricated narratives about the students' athletic abilities, making it appear that the narratives were written by USC's athletic coaches. *See, e.g.*, *id.* ¶ 197 (describing the athletic profile Heinel presented to Subco for the daughter of defendant Michelle Janavs, which included a narrative purportedly written by the women's beach volleyball coach in a section titled "Coach Collier's Notes"). Heinel was even willing to falsify the *academic* qualifications of Singer's students to ensure that they made it past Subco. *See id.* ¶ 202 (offering to white out an incomplete on Agustina Huneeus's transcript). Moreover, Heinel not only lied on the front end to secure the admission of Singer's applicants, but she also lied on the back end to insulate the students who were in the dark about their purported recruitments and thereby avoid detection. *See, e.g.*, *id.* ¶ 184 (agreeing to "take care of" a student's designation as a track and field athlete so that he would not receive communications about practice times and athletic meetings).

Heinel's only concern upon becoming involved in the scheme was whether Singer's families were good for the money so that Heinel could use that money for her own self-advancement. And when high school counselors raised red flags, she doubled down on her lies to

cover her tracks, and those of her co-conspirators, and to make sure that the scheme would survive. In short, the level of Heinel's deceit and the depth of her corruption were staggering.

In both the number of times she agreed to falsely present students as athletic recruits in exchange for bribe payments and the degree of her dishonesty, Heinel's participation in the scheme was more akin to Ernst's than Salcedo's. And like Ernst's, Heinel's scheming extended beyond her association with Singer. Heinel engaged in eight times as many side-door deals as Salcedo – warranting a sentence significantly longer than the eight months he received. Indeed, even subtracting the payments to USC athletic funds that Heinel controlled, Heinel's conduct was more egregious than Salcedo's because, although she ultimately received only $160,000 in payments before the government arrested her, she expected to receive $400,000 from Singer for four athletic recruitment slots and one VIP designation. Salcedo, on the other hand, received half that amount – $200,000 – in personal payments in exchange for designating three Singer students as soccer recruits.

Heinel has also continued to minimize her involvement and attempted to mislead the Court by declining to admit that the payments to her company, Clear the Clearinghouse, were tied to the athletic recruitment scheme. Instead, in her pre-sentence interview, she claimed that she sold the business to Singer for $400,000 to be paid in monthly installments. *See id.* ¶ 270. The evidence flatly contradicts that claim. For example, the day before the first $20,000 payment, in the same email chain in which they discussed the admission of a Singer student off the VIP list, Singer asked Heinel, "What title of company and address should I send the invoice to for consultant services[?]." *Id.* ¶ 181. The same day, Heinel sent Singer a Clear the Clearinghouse invoice in the amount of $20,000 for "Consulting Services." *Id.* There would be no reason for Heinel to issue consulting invoices for the purchase of her company, and surely there was no need for Singer to ask for the

name of the company he was supposedly purchasing. Further, when Singer, at the direction of law enforcement, asked Heinel to "put some detail" in the next invoice, Heinel agreed and, as depicted below, described the purported consulting services as "[i]nterview, evaluation and assessments for prospective students from [the high schools of various Singer applicants]." *Id.* ¶¶ 195, 201, 207. Heinel agreed to include the same type of detail going forward so it "looks a little better." *Id.* ¶ 209.

## Clear The Clearinghouse

*Counting Stars*
*518 Santa Ana*
*Newport Beach, CA 92663*

### Invoice #0105

Date 11/01/18

| Quantity | Item/Description | Attendee | Unit Price | Total |
|---|---|---|---|---|
| 1 | **Consulting Services** | | **$20,000.00** | **$20,000.00** |
| | Interview, evaluation and assessments for prospective students from | | | |
| | 1. Hong Kong International School<br>   Abdelaziz | | | |
| | 2. The Bay School<br>   Blake | | | |
| | 3. Cathedral Catholic<br>   Bizzack | | | |

If Heinel had legitimately sold her company, as she contends, there would have been no reason for her to falsify invoices claiming she had provided consulting services – much less for students who were admitted to USC under false pretenses, based on her lies to the admissions department.

A significant sentence of imprisonment is necessary to reflect the nature and seriousness of Heinel's offense. Considerations of both general and specific deterrence similarly counsel in favor of a meaningful term of incarceration. As the college admissions cases have made clear, it is all too easy for coaches to solicit and accept bribes in exchange for athletic recruitment slots, and it is difficult for universities, and criminal authorities, to detect and prevent such fraud. That is all

the more true for athletic department administrators like Heinel who serve a gatekeeper function. With respect to specific deterrence, while Heinel ultimately pled guilty, she did so on the eve of trial, and, as demonstrated by her objections to the PSR, she remains reluctant to accept responsibility for her actions. While it is unlikely that Heinel will ever again be in a position to commit the same offense, she may face circumstances that require her to choose between doing what is right and engaging in fraud or lying, and a meaningful term of imprisonment will have the necessary specific deterrent effect to ensure that she does not violate the law again.

The need to avoid unwarranted sentencing disparities also supports a relatively lengthy period of incarceration. As discussed above, Heinel is most comparable to Ernst, who received a sentence of 30 months, and her conduct was significantly more extensive than that of Salcedo, who received a sentence of eight months. Heinel's conduct was also more egregious than that of the parents who engaged in Singer's side-door scheme, not merely because it was far broader in scope and duration, but also because she personally violated her duty to USC, abusing her position and the university's trust out of pure self-interest – not out of any desire to help her own children gain admission to college – thereby corrupting the integrity of the college admissions process, which already favors those with wealth and privilege.

The longest sentence imposed on a parent was 15 months for John Wilson, who was convicted at trial for participating in the athletic recruitment scheme for all three of his children (and also for engaging in tax fraud). Because Heinel's conduct was substantially more extensive than Wilson's, a substantially longer sentence is warranted. The average sentence imposed on parents who engaged in Singer's side-door scheme has been approximately three months per child. The government's recommended sentence of 24 months for Heinel takes account of, and compares

favorably to, that average: one month for each of the two dozen phony recruits she presented to Subco in exchange for bribes.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Heinel to a term of imprisonment of 24 months, followed by 24 months of supervised release, and order forfeiture in the amount of $160,000.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  */s/ Leslie A. Wright*
LESLIE A. WRIGHT
IAN J. STEARNS
KRISTEN A. KEARNEY
KRISS BASIL
STEPHEN E. FRANK
Assistant United States Attorneys

## Certificate of Service

I hereby certify that this document was filed through the ECF system on November 22, 2022 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:     */s/ Leslie A. Wright*　　　　　　　
             LESLIE A. WRIGHT
             Assistant United States Attorney