UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DONNA HEINEL, )<br>)<br>Defendant )<br>) | Criminal No. 19-10081-IT |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The government respectfully submits this response to defendant Donna Heinel's sentencing memorandum. The defendant's 500-plus page submission contains numerous unsupported claims, misstatements of fact, and mischaracterizations of the evidence, which bear noting before sentencing.

First, Heinel repeatedly claims that the athletic department at the University of Southern California ("USC") condoned the practice of presenting sub-par athletes to the subcommittee on athletic admissions ("Subco") to secure their admission as recruited walk-ons in exchange for donations. But there is no evidence that USC ever condoned Heinel's criminal conduct. Heinel falsified the athletic credentials of purported walk-on recruits to secure their admission behind the backs of USC's athletic coaches, knowing that the purported recruits had no prospect of joining the teams and no intention of doing so – all in exchange for payments that she admits she "siloed" into a USC athletic fund to serve her own interests. Further, Heinel often mischaracterizes the evidence she cites in support of her claim that this "was a regularly accepted use of SUBCO in the athletics department." Def. Mem. at 16 n.14. For example, she points to an email chain discussing an applicant who was "essentially promised a walk-on position so he could train for the [track and

field] team." *See* Ex. E to Def. Mem. at 5-7. However, the email chain makes clear that the applicant had already been admitted to USC and "was only promised to work out with the team" when he arrived on campus. There is no indication that the applicant was approved for admission by Subco, much less on the basis of falsified athletic credentials and without any involvement or knowledge on the part of the coaching staff. In sum, there is no evidence that USC condoned Heinel's deception or her misuse of athletic recruitment spots to obtain money for her own career advancement.

Second, Heinel (while professing to take full responsibility for her conduct) claims that the "embellishments" she added to the athletic profiles of Singer's applicants[1] – and the "further information" she provided to the admissions department regarding the applicants about whom high school counselors had raised red flags – were based on information she received from Singer.[2] Heinel asserts that Singer provided some of that information in text messages. For example, she points to a text message she received from Singer that passed along a message from defendant Devin Sloane, stating, "I just received a very positive call from the Buckley [high school] counselor advising she spoke with Kirk [Brennan, the director of undergraduate admissions at

---

[1] Heinel insists that she embellished the athletic profiles of Singer's applicants only after Lynn Swann replaced Pat Haden as the athletic director at USC and promoted Heinel, which she claims resulted in increased pressure to fundraise, rendering Subco approval of Singer's applicants more imperative. But there is no indication that Subco had denied the admission of Singer applicants due to inadequate athletic ability prior to Swann's tenure, and fundraising had long been "baked into [Heinel's] job descriptions," a fact she continually relies upon in minimizing responsibility for her conduct. Def. Mem. at 17.

[2] Heinel repeatedly points to her "implicit" trust in Singer, citing an October 24, 2018 call between the two. *See* Def. Mem. at 17, 27. But the discussion during that call had nothing to do with trusting Singer to send her real athletes or accurate athletic profiles. Rather, Singer and Heinel discussed whether they were "up to date" on the $20,000 monthly payments and when the families of two applicants should "send the $50,000 check." *See* Ex. N to Def. Mem. It was in that context – ensuring that Singer and his clients paid Heinel what she was owed in a timely manner – that Heinel told Singer, "I trust you implicitly." *Id.*

USC] and everyone's in full support of [Sloane's son] being at USC." Def. Mem. at 28. But that provides no support for the proposition that Singer provided Heinel with the false information she sent to Brennan to assure admissions that Sloane's son was a legitimate recruit. *See* PSR ¶ 173. So, to bridge the gap, Heinel contends that the text messages "seem to pick up from a previous conversation" that must have taken place on one of "the numerous phone calls" between Heinel and Singer that occurred before – and therefore were not captured on – the court-authorized wiretap of Singer's phone. Def. Mem. at 32.

Putting the convenience of that explanation aside, Heinel asserts that it was on those phone calls that Singer provided "additional information regarding the student athletes, *including his representations that the USC coaches had an interest in those athletes.*" *Id.* at 33 (emphasis added). Elsewhere in her sentencing memorandum, Heinel claims that she believed USC's athletic coaches wanted Singer's applicants on their teams. *See id.* at 16. That is preposterous. As noted in the government's sentencing memorandum, Heinel went forward with presenting a Singer student to Subco as a lacrosse recruit even after the coach told Heinel's assistant that the student was "not [a lacrosse] prospect." *See* PSR ¶¶ 117-18. And after assuring admissions officials that Sloane's son was a legitimate water polo recruit, Heinel told Singer, "Just if questioned, don't bring Jovan [then the head water polo coach] into this." *Id.* ¶ 173. Moreover, Heinel *chose* to present the daughter of defendant Michelle Janavs as a beach volleyball as opposed to an indoor volleyball recruit. *See id.* ¶ 193.[3] Which coach did Heinel believe was interested in Janavs's daughter, or was it both? And

---

[3] The same is true of defendant Doug Hodge's son. Laura Janke initially told Heinel that he was "a basketball and tennis player." PSR ¶ 58. Janke then sent Heinel two athletic profiles of Hodge – one for tennis and the other for football. *Id.* ¶ 61. Heinel ultimately chose to present Hodge to Subco as a purported football recruit. *See id.* ¶¶ 63 (Heinel telling Janke, "I think I'm going with football"), 65 (Heinel telling Janke, "[Hodge] is in. Walk on football."). While Heinel may not have been aware of the connection to Singer, she cannot credibly claim that she believed

why would Heinel need to "take care of" Elisabeth Kimmel's son's designation as a track and field athlete – so that he would not receive communications about practice times and athletic meetings – if she believed the coaching staff wanted him on the team? *See id.* ¶ 184. In short, the evidence is clear that USC's athletic coaches had no knowledge of, much less any interest in, Singer's applicants, and that Heinel was well aware of that fact.

Third, Heinel presents the false narrative that she did due diligence on Singer's applicants, claiming that she "frequently queried Singer regarding the students' activity in the sport, confirmed [their] athletic ability, and advised Singer what the students needed to do to ensure they remained eligible walk-ons for the teams at USC." Def. Mem. at 15-16. But the communications she cites in support of this claim occurred either in the context of high school counselors raising red flags about Singer's applicants, when Heinel was concerned that "disturbance[s]" by the parents would "shut everything down," PSR ¶ 174, or in the following months when Heinel was more careful to avoid detection. *See id.* ¶¶ 206 (Heinel telling Singer that she wanted to make sure the daughter of defendant Agustin Huneeus was "known as a water polo player" because "they . . . Googled her and knew that her father was in the wine business"), 218 (Heinel notifying Singer via text message that Huneeus needed to confirm she was being recruited because her high school counselor had advised a USC admissions official that she did not believe that to be the case). Heinel's memorandum takes these statements out of context and mischaracterizes them as queries to ensure that Singer's applicants were talented athletes, when in reality she was being more careful to avoid detection after nearly getting caught.

---

the USC football coach wanted Hodge – referred to her by Janke, a former assistant soccer coach – to be a member of the football team.

Finally, Heinel contends that "Singer's conflicting explanations" for the $20,000 monthly payments to Clear the Clearinghouse "make no sense," while her "truthful explanations do." Def. Mem. at 26. But there is no need to rely on Singer's statements to come to the conclusion that the payments were in exchange for Heinel falsely presenting his applicants to Subco as athletic recruits and that the "consulting" arrangement[4] was a sham – the evidence makes that clear. In October 2017, Heinel left Singer a voicemail proposing that they discuss how to "structure" the payment for defendant Gamal Abdelaziz's daughter, since that was "a larger amount of money." PSR ¶ 144. Heinel then directed Singer to have some of his clients make their checks payable to the Galen Center gift account and told him, "I think we're going to do that with [Abdelaziz] too" – *i.e.*, a check to the Galen Center "[f]or 200,000." *Id.* ¶ 155. But that did not happen, and a few months later, high school counselors advised USC admissions officials that they "were quite surprised to hear [several Singer applicants] were being admitted as athletic recruits." *Id.* ¶ 171. It was only a few months after successfully allaying those concerns that Heinel began sending Singer invoices for "consulting services" and receiving payments of $20,000 per month. *Id.* ¶¶ 181-82.[5]

---

[4] Heinel variously claims that the payments were for consulting services, the purchase of Clear the Clearinghouse, or both. There is no support for the notion that Heinel sold her business to Singer, and Heinel cites none, aside from a text message she sent to her subordinate stating that she sold the company (but saying nothing of Singer) and her own statements as reflected in the doctor's report appended as Exhibit A to her sentencing memorandum. In any event, the claim is belied by the fact that Clear the Clearinghouse, supposedly purchased by Singer, was issuing invoices to Singer's company, as well as the fact that Heinel personally cashed the checks made payable to the company she purportedly sold.

[5] The government's sentencing memorandum incorrectly states that Singer asked Heinel for the name and address of the company to which the invoices should be sent. *See* ECF 1438 at 10. This was an error. As stated in the offense conduct prepared by the government and submitted to the Probation Office, it was Heinel who asked Singer, "What title of company and address should I send the invoice to for consultant services[?]" PSR ¶ 181.

The fact that Heinel and Singer discussed the payments as being for consulting (or compliance) services does not make it true, and the invoices Heinel sent Singer reveal the sham nature of any purported consulting agreement. *See id.* ¶¶ 207, 213, 216, 219. Heinel claims (in a footnote) that the invoice she prepared and sent to Singer listing the students (including Abdelaziz) that Singer and Heinel had "collaborated on for admission at USC" were "a poorly described way of indicating the future work" Heinel intended to do with Singer. Def. Mem. at 19 n.17. In Heinel's telling, that invoice "merely [] list[ed] [] the high schools of the students in alphabetical order from the beginning of [Singer and Heinel's] relationship[.]" *Id.* But elsewhere in her sentencing memorandum, Heinel suggests that the payments were for consulting services that had already been provided or were ongoing. And if the payments were instead for future services, why did Heinel list the names of applicants whose admission to USC she had already secured? Further, if this were all on the up-and-up, why did Heinel need to be "much more descriptive[]" to make it "look[] a little better"? PSR ¶¶ 201, 209.

Heinel may have included Abdelaziz's name in the invoice because it came first in her mind alphabetically, but the fact remains that she never provided any consulting services for Abdelaziz (and certainly did not intend to in the future). Heinel's only involvement with Abdelaziz consisted of fabricating her athletic profile and falsely presenting her to Subco as a basketball recruit. Moreover, if the $20,000 payments were not for Abdelaziz and other Singer applicants, that would leave Heinel uncompensated for securing the admission of those applicants – and that was not something she had ever done for free.[6] In short, Heinel's explanations for the payments to

---

[6] In declining to admit that the personal payments were bribes, Heinel states that "[f]or the three years prior to her receipt of personal payments from Singer, [she] was already presenting Singer's students to SUBCO for nothing in return to her personally." Def. Mem. at 21-22. But of course, she was doing that in return for payments to the Women's Athletic Board (among other funds) that she acknowledges were of value to her personally.

6

Clear the Clearinghouse (all of which were deposited into her personal bank account) are not credible.

The government respectfully submits that Heinel's continued efforts to minimize and justify her criminal conduct further support the government's recommended sentence of 24 months in prison.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Leslie A. Wright*
      LESLIE A. WRIGHT
      IAN J. STEARNS
      KRISTEN A. KEARNEY
      KRISS BASIL
      STEPHEN E. FRANK
      Assistant United States Attorneys

Certificate of Service

I hereby certify that this document was filed through the ECF system on December 1, 2022 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:    */s/ Leslie A. Wright*
      LESLIE A. WRIGHT
      Assistant United States Attorney